*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0102P (6th Cir.)
File Name: 04a0102p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SHEILA WHITE,
    *Plaintiff-Appellee/*
    *Cross-Appellant,*

      *v.*

BURLINGTON NORTHERN &
SANTA FE RAILWAY CO.,
    *Defendant-Appellant/*
    *Cross-Appellee.*

Nos. 00-6780;
01-5024

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 99-02733—Jon Phipps McCalla, District Judge.

Argued: June 11, 2003

Decided and Filed: April 14, 2004

Before: BOGGS, Chief Judge; MARTIN, KRUPANSKY,
BATCHELDER, DAUGHTREY, MOORE, COLE,
CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, and
COOK, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Bryan P. Neal, THOMPSON & KNIGHT, Dallas, Texas, for Appellant. William B. Ryan, DONATI LAW FIRM, Memphis, Tennessee, for Appellee. **ON BRIEF:** Bryan P. Neal, THOMPSON & KNIGHT, Dallas, Texas, Ralph T. Gibson, BATEMAN GIBSON, Memphis, Tennessee, for Appellant. William B. Ryan, Donald A. Donati, DONATI LAW FIRM, Memphis, Tennessee, for Appellee. Ann E. Reesman, Robert E. Williams, McGUINESS, NORRIS & WILLIAMS, Washington, D.C., Jenifer M. Bosco, NATIONAL EMPLOYMENT LAWYERS ASSOCIATION, San Francisco, California, Ralph E. Lamar IV, Collegeville, Pennsylvania, for Amici Curiae.

───────────────

## OPINION

───────────────

GIBBONS, J., announced the judgment and majority opinion of the *en banc* court on all issues. The entire *en banc* court joined Parts I (Background) and III (Attorney's Fees) of the majority opinion. Part II (Adverse Employment Action) of the majority opinion was joined by BOGGS, C. J., and KRUPANSKY, BATCHELDER, GILMAN, ROGERS, SUTTON, and COOK, JJ., and Part IV (Punitive Damages) was joined by MARTIN, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, and COOK, JJ. CLAY, J. (pp. 36-51), filed a separate concurring opinion joining Parts I, III, and IV of the majority opinion and writing separately as to Parts II and V, in which he was joined by MARTIN, DAUGHTREY, MOORE, and COLE, JJ. SUTTON, J. (pp. 52-85), filed an opinion concurring in Parts I - III and dissenting from Parts

IV and V, in which he was joined by BOGGS, C. J., and KRUPANSKY, BATCHELDER, and ROGERS, JJ.

JULIA SMITH GIBBONS, Circuit Judge. In this appeal, the *en banc* court addresses the meaning of "adverse employment action" for purposes of Title VII. We decide that a thirty-seven day suspension without pay constitutes an adverse employment action regardless of whether the suspension is followed by a reinstatement with back pay. We also address several other issues raised by this appeal.

Sheila White brought this action against her employer, Burlington Northern & Santa Fe Railway Company (Burlington Northern), alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3. The jury returned a verdict in favor of Burlington Northern on the sex discrimination claim and in favor of White on the retaliation claim. The jury awarded White compensatory damages but no punitive damages. After the trial, the district court denied Burlington Northern's motion for judgment as a matter of law on the retaliation claim and granted White's motion for attorney's fees.

Burlington Northern appeals from the denial of its motion for judgment as a matter of law and from the award of attorney's fees to White. White cross-appeals, challenging the district court's jury instruction regarding punitive damages. For the reasons set forth below, we affirm the district court's denial of Burlington Northern's motion for judgment as a matter of law and the district court's award of attorney's fees to White. We conclude, however, that the district court erred in instructing the jury on the issue of punitive damages, and therefore we remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND

Before June 1997, Ralph Ellis operated the stationary forklift for Burlington Northern at its Tennessee Yard in Memphis. In June 1997, Ellis resigned from the forklift position in order to work on a mobile track gang, in which position Ellis earned more pay than he would have if he had continued working in the forklift position. Marvin Brown, roadmaster of the Tennessee Yard, interviewed White for a job with Burlington Northern and expressed interest in White's experience operating a forklift. On June 23, 1997, Burlington Northern hired White to work in its Maintenance of Way department at its Tennessee Yard, and following White's hire, Brown assigned her to operate the forklift at the Tennessee Yard.

White was the only female working in the Maintenance of Way department at the Tennessee Yard. White's immediate supervisor was foreman Bill Joiner. Joiner had never supervised a woman before, and he admitted at trial that he treated White differently because of her gender. He also admitted that he did not believe that the Maintenance of Way department was an appropriate place for women to work. According to White, Joiner repeatedly expressed this belief to her while she was working under his supervision. According to Joiner, several other Burlington Northern employees also expressed the belief that women should not work on a railroad. Another Burlington Northern employee agreed at trial that there was "a general anti-woman feeling" among Burlington Northern employees at the Tennessee Yard.

Despite concerns about the propriety of a woman working on the railroad, the evidence was uncontradicted that White did not have difficulty performing her job. According to Brown, he never received a complaint regarding White's performance operating the forklift. Joiner testified that White had no problems performing her job. Furthermore, another Burlington Northern foreman testified that no one expressed

concern about White's ability to get along well with others in the workplace or about anything specific to White other than her gender.

On September 16, 1997, White complained to Brown and other company officials about specific incidents of alleged sexual harassment committed by Joiner. The company investigated. Following the investigation, Burlington Northern suspended Joiner for ten days and ordered him to attend a training session regarding sexual harassment.

On September 26, 1997, Brown met with White to inform her that Joiner had been disciplined pursuant to her complaint. He also, however, told her that the company had learned during the investigation of several complaints about her working in the forklift position. According to Brown, the complaints did not relate to her performance but related to the fact that the forklift position was a less arduous and cleaner job than other track laborer positions. Brown testified that other employees, including Ellis, complained about a junior employee being allowed to work the forklift instead of "a more senior man." Other witnesses testified that the forklift job was generally considered a physically easier and cleaner job than other track laborer positions, although it required more qualifications. Joiner testified that other track laborers complained about White being allowed to hold the position instead of a male employee.

During the September 26 meeting regarding the resolution of White's internal sexual discrimination complaint, Brown informed White that he was removing her from the forklift position and assigning her to a standard track laborer position because of her coworkers' complaints. Her pay and benefits remained the same, but her new job was, by all accounts, more arduous and "dirtier" than the forklift position. Brown replaced White with Ellis, the only other employee qualified to perform the forklift job. Brown admitted at trial that he had heard complaints about White being allowed to work the

forklift before she complained of discrimination but that he did not remove her from the position until after she complained of discrimination.

Brown's trial testimony is inconsistent with Burlington Northern's interrogatory response. In that response, the railroad stated that it removed White from the forklift position because a more senior employee claimed the job according to the collective bargaining agreement. Brown, however, testified at trial that the forklift job was not governed by the collective bargaining agreement and that he had the discretion to place anyone he chose in that position regardless of seniority. Moreover, neither the union, nor anyone else, initiated a grievance about White's operation of the forklift. A union official testified that the union's records did not reflect any complaints regarding White's assignment to the forklift position. Only White and Ellis were qualified to perform the forklift position. Ellis, who had voluntarily resigned from the forklift job for a higher-paying job, testified that he did not complain to Brown or anyone else about White operating the forklift and that he did not request that he be returned to the position.

On October 10, 1997, White filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging sex discrimination and retaliation. She filed a second charge with the EEOC on December 4, 1997, alleging retaliation. In her second EEOC charge she alleged that Brown had placed her under surveillance and was checking on her daily activities. Her second EEOC charge was mailed to Brown on December 8, 1997.

On December 11, 1997, White was working in Blytheville, Arkansas, supporting a regional tie gang. She was working under the supervision of Burlington Northern foreman Percy Sharkey. At some point during the day, Sharkey instructed White to ride in a truck with another foreman, James Key. Sharkey instructed another track laborer, Greg Nelson, to ride

with him in his vehicle. According to White, when she approached Key he told her that she had to ride with Sharkey because Key wanted Nelson to ride with him. Against Sharkey's order, Nelson rode away with Key. White testified that Sharkey became very upset when she returned and told him that Nelson had ridden away with Key and that she would have to ride with him. Contrary to White's testimony, Sharkey testified that White refused to ride with Key, claiming that she had seniority over Nelson and insisting upon riding with Sharkey.

According to Sharkey, he called Brown to discuss the situation and Brown told him that, based on Sharkey's description of events, White had been insubordinate and should be removed from service immediately. On the afternoon of December 11, Sharkey informed White that she was suspended. Although Sharkey had the authority to suspend White himself, Sharkey testified that Brown made the decision to suspend White. Brown testified that Sharkey made the decision. White testified that Sharkey told her at the time that Brown had instructed him to suspend her. In a letter to the EEOC, Burlington Northern stated that Brown made the decision, but Brown testified that this letter was incorrect. Nelson received no discipline, although Sharkey acknowledged at trial that Nelson had disobeyed his direct order.

White testified that Sharkey had told her at some point before her suspension that Brown considered White a "troublemaker." Sharkey acknowledged at trial that he had told White that the railroad was trying to "get rid" of her.

The decision to suspend White occurred seven days after White filed her second EEOC charge and three days after the charge was mailed to Brown. The suspension took effect immediately and was without pay. According to company policy, the suspension without pay would automatically become a termination if White did not file a grievance with

her union appealing the decision within fifteen days. White timely filed such a grievance and also filed another EEOC charge on December 15, 1997, alleging retaliation.

While her grievance was pending, White was without a job and without income and she did not know if or when she would be allowed to return to work. During this period, White sought medical treatment for emotional distress and incurred medical expenses. The grievance remained pending through the end of December and the first half of January 1998. After an investigation and a hearing, the hearing officer, who was a Burlington Northern manager, found that White had not been insubordinate and that she should not have been suspended. After being suspended without pay for thirty-seven days, White was reinstated to her position with full back pay on January 16, 1998.

After exhausting her avenues for relief before the EEOC, White filed this action against Burlington Northern in the district court, alleging sex discrimination and retaliation in violation of Title VII. A jury trial was conducted from August 29, 2000, to September 5, 2000. The jury returned a verdict in favor of Burlington Northern on White's sex discrimination claim and a verdict in favor of White on her retaliation claim. The jury awarded White $43,500 in compensatory damages, including $3,250 in medical expenses, on her retaliation claim. The jury found against White on her claim for punitive damages. After the trial, pursuant to Federal Rule of Civil Procedure 50(b), Burlington Northern filed a renewed motion for judgment as a matter of law on the retaliation claim, which the district court denied. White filed a motion for an award of attorney's fees pursuant to 42 U.S.C. § 2000e-5(k), and the district court awarded White $54,285, which represented eighty percent of White's total attorney's fees.

## II.  MOTION FOR JUDGMENT AS A MATTER OF LAW

We first review the district court's denial of Burlington Northern's post-trial motion for judgment as a matter of law pursuant to Rule 50(b).  Our standard of review is *de novo*.  *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001).  The inquiry for resolving a motion for judgment as a matter of law pursuant to Rule 50 is the same as the inquiry for resolving a motion for summary judgment pursuant to Rule 56.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  We review all of the evidence in the record in the light most favorable to the nonmoving party and determine whether there was a genuine issue of material fact for the jury.  *Gray*, 263 F.3d at 598.

We must affirm the jury verdict unless there was "no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party."  Fed. R. Civ. P. 50(a).  We draw all reasonable inferences in favor of the prevailing party, and we do not make any credibility determinations or weigh the evidence.  *Reeves*, 530 U.S. at 150.  Therefore, we "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Id.* at 151.  "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 300 (1986)).

Burlington Northern contends that it is entitled to judgment as a matter of law on White's  retaliation claim because, according to Burlington Northern, neither White's transfer from the forklift job to a standard track laborer job nor her suspension without pay for thirty-seven days constitutes an adverse employment action for purposes of Title VII.  In the alternative, Burlington Northern contends that there was insufficient evidence for the jury to conclude rationally that Burlington Northern's asserted legitimate, non-discriminatory reasons for transferring and suspending White were pretexts for retaliation.

In determining whether Burlington Northern is entitled to judgment as a matter of law, we first discuss the meaning of "adverse employment action" for purposes of Title VII.  Then we discuss whether White's transfer and suspension were adverse employment actions.  Finally we address whether there was sufficient evidence for the jury to rationally find that Burlington Northern's asserted legitimate reasons were pretexts for unlawful retaliation.

### A.  Defining Adverse Employment Action

Title VII's anti-retaliation provision provides:

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to *discriminate against* any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (section 704(a) of Title VII) (emphasis added).  Title VII does not define the phrase "discriminate against," which is repeated in Title VII's other anti-discrimination provisions, but courts have made clear that not just any discriminatory act by an employer constitutes discrimination under Title VII.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citing cases requiring a "tangible employment action" to support a Title VII claim).

Employment actions that are *de minimis* are not actionable under Title VII. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999).

To prevent lawsuits based upon trivial workplace dissatisfactions, we require that a plaintiff prove the existence of an "adverse employment action" to support a Title VII claim. *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (defining "adverse employment action" as a "materially adverse change in the terms and conditions of [plaintiff's] employment").[1] This case requires us to clarify further the meaning of "adverse employment action" for purposes of Title VII.

The first time this court required a plaintiff to prove the existence of an "adverse employment action" as part of a Title VII claim was in *Geisler v. Folsom*, 735 F.2d 991 (6th Cir. 1984). In *Geisler*, the plaintiff alleged that her employer violated Title VII's anti-retaliation provision by discriminating against her for filing a sex discrimination

---

[1] Although this court and most other courts use the term "adverse employment action," some courts, including the Supreme Court, use the term "tangible employment action" or some other variation for the same concept. *See, e.g., Burlington Indus.*, 524 U.S. at 761 ("tangible employment action"); *Bowman*, 220 F.3d at 461 n.5 ("Courts use the terms 'tangible employment detriment' and 'materially adverse employment action' interchangeably.").

As the one alternative to showing the existence of an adverse employment action, a plaintiff may support a Title VII claim by showing that "plaintiff was subjected to severe or pervasive retaliatory [or other discrimination based] harassment by a supervisor." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). What constitutes severe or pervasive harassment is not at issue in this appeal.

charge with the EEOC. After a bench trial, the district court found that "[p]laintiff failed to show any adverse employment action in response to her EEOC charge or any other protected activity. While additional tension arose after others became aware of [plaintiff]'s charge, such 'predictable tension' is not 'the type of adverse employment action prohibited by Title VII's retaliation clause.'" 735 F.2d at 994 (quoting the district court). This court affirmed, stating:

> We agree with the district judge that a general increase of tension in the workplace would be expected to follow revelation that a claim of discrimination in employment had been filed. However, evidence of such an increase should be considered, and any discrete act or course of conduct which could be construed as retaliation must be examined carefully. After such examination we conclude that the finding that no 'adverse employment action' resulted from the filing of the EEOC charge is not clearly erroneous, particularly in view of the contrary evidence . . . .

735 F.2d at 996 (quoting the district court's use of the phrase "adverse employment action").

A few months after deciding *Geisler*, this court stated that to support a claim for retaliation under Title VII a "plaintiff must establish: (1) that he engaged in activity protected by Title VII; (2) that he was the subject of adverse employment action; and (3) that there exists a casual [sic] link between his protected activity and the adverse action of his employer." *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984). The *Jackson* court did not cite *Geisler* as a basis for including "adverse employment action" among the elements of a Title VII retaliation claim; instead it relied upon cases from the Fifth, Tenth, and Eleventh Circuits. *Id.* (citing *Burrus v. United Tel. Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir. 1982); *Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98, 101 (11th Cir. 1982); *Whatley v. Metro. Atlanta Rapid*

*Transit Auth.*, 632 F.2d 1325, 1328 (5th Cir. 1980)).  The cases cited by *Jackson*, like *Jackson* itself, each involved a termination of employment, and so none of these cases addressed the issue of what types of employment actions short of termination constitute adverse employment actions.[2]

Ever since *Geisler* and *Jackson*, the adverse-employment-action element has remained a part of a Title VII claim in this circuit.  After *Geisler*, the first time that this court decided a case based on the adverse-employment-action element was in *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987).  In *Yates*, this court reversed a district court's factual finding of retaliation, holding that it was clear error for the district court to find that a temporary job reassignment that resulted in no pay or benefits reduction was an adverse employment action cognizable under Title VII's anti-retaliation provision.  For this holding, the *Yates* court relied solely upon a district court decision from Delaware.  *Id.* (citing and endorsing *Ferguson v. E.I. duPont deNemours and Co.*, 560 F. Supp. 1172, 1201 (D. Del. 1983), which held that a job reassignment is not an adverse employment action if it is only temporary and results in no reduction in pay or benefits).

---

[2]The decisions cited by *Jackson* from the Tenth and Eleventh Circuits, *Burrus* and *Jones*, both cite *Smalley v. City of Eatonville*, 640 F.2d 765, 769 (5th Cir. 1981), which in turn cites *Whatley* as the basis for including "adverse employment action" among the elements of a Title VII claim.  *Whatley* cites a treatise published in 1976.  632 F.2d at 1328 (citing B. Schlei & P. Grossman, Employment Discrimination Law, Ch. 15 (1976)).  It appears that the inclusion of "adverse employment action" as an element of a Title VII claim originated with the treatise cited by *Whatley*. *See Williams v. Boorstin*, 663 F.2d 109, 120 (D.C. Cir. 1980) (J. Bazelon, concurring) (stating that "adverse employment action" is among the elements of a Title VII retaliation claim under "the standard found in B. Schlei & P. Grossman, Employment Discrimination Law 436 (1976)").  The first reported case in the nation to include "adverse employment action" as an element of a Title VII claim was decided the year after publication of the treatise.  *EEOC v. Locals 14 and 15 Int'l Union of Operating Eng'rs*, 438 F. Supp. 876, 881 (S.D.N.Y. 1977).

After *Yates*, it was almost ten years before we had another opportunity to develop the definition of adverse employment action.  In *Kocsis v. Multi-Care Management Inc.*, this court considered the definition of adverse employment action in the context of a discrimination claim under the Americans with Disabilities Act.  97 F.3d 876, 885-87.  Relying in part upon the Seventh Circuit's definition, this court held that a plaintiff claiming employment discrimination must show that she suffered "a materially adverse change in the terms of her employment."  *Id.* at 885 (citing *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883 (7th Cir. 1989), which involved an age discrimination claim).  A "mere inconvenience or an alteration of job responsibilities" or a "bruised ego" is not enough to constitute an adverse employment action.  *Id.* at 886 (citing *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993), and *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994)).

Furthermore, according to *Kocsis*, "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."  *Id.* at 885 (citing *Yates*, 819 F.2d at 638, which applied to "temporary" reassignments).  A reassignment without salary or work hour changes, however, may be an adverse employment action if it constitutes a demotion evidenced by "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Id.* at 886 (citing *Crady*, 993 F.2d at 136).

In this circuit, *Kocsis* is the seminal case for defining adverse employment action.[3]   The Supreme Court in

---

[3]For instance, in *Hollins v. Atlantic Co.*, this court relied upon *Kocsis* to decide that an employee had not suffered an adverse employment action when she received lower ratings in a performance evaluation.  188 F.3d 652, 662 (6th Cir. 1999).  The *Hollins* court held that lower ratings

*Burlington Industries v. Ellerth* relied upon *Kocsis* and several decisions from other circuits when it stated that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  524 U.S. 742, 761 (1998).  The Supreme Court also observed that:

> A tangible employment action in most cases inflicts direct economic harm . . . .  Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.  A tangible employment decision requires an official act of the enterprise, a company act.  The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors.

*Id.* at 762.  *But see Ray v. Henderson*, 217 F.3d 1234, 1242 n.5 (9th Cir. 2000) (rejecting the contention that *Burlington Industries* set forth a standard for adverse employment actions in the retaliation context).

In this appeal, White and the EEOC, which has filed an *amicus curiae* brief on White's behalf, urge us to revise our definition of adverse employment action for purposes of Title VII retaliation cases and adopt the interpretation included in

---

were not enough in the absence of "evidence to show that the lowered performance ratings actually had an effect on her wages such that a court may conclude that there was a materially adverse employment action."  *Id.*  In *Bowman v. Shawnee State University*, this court relied upon *Kocsis* and *Hollins* to hold that the temporary removal of a university instructor from his position as the Coordinator of Sports Studies did not rise to the level of an adverse employment action.  220 F.3d 456, 461-62 (6th Cir. 2000).  The *Bowman* court focused on the facts that the removal was for only ten days, the employee maintained his position as a full-time university instructor, and he never lost any income.  *Id.*

the EEOC Guidelines.  The EEOC has interpreted "adverse employment action" in the context of a Title VII retaliation claim to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter a charging party or others from engaging in protected activity."  EEOC Compliance Manual § 8, "Retaliation," ¶ 8008 (1998).  Although EEOC Guidelines are not binding on the courts, they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The EEOC claims that this court's development of the adverse-employment-action element has been unfaithful to the letter and purpose of Title VII's anti-retaliation provision.  According to 42 U.S.C. § 2000e-3(a), it is unlawful for an employer to "discriminate against" an employee for engaging in protected conduct.  The EEOC contends that the most natural reading of this language is that it prohibits "any form of discrimination" against an individual for opposing discrimination or filing a charge.  The Ninth and Seventh Circuits have also embraced a broad interpretation of Title VII's anti-retaliation provision.  *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) ("This provision does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination."); *Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996) ("There is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint.").[4]

---

[4] We have recognized that the dictionary definition of "discriminate" is "to distinguish; to make distinctions in treatment; show partiality or prejudice."  *Mattei v. Mattei*, 126 F.3d 794, 804 (6th Cir. 1997) (quoting Webster's New World Dictionary); *see also* Oxford English Dictionary

Despite the EEOC's contention that "any form of discrimination" falls within the most natural reading of the statute, the EEOC acknowledges in its brief that its definition of adverse employment action excludes "petty slights and trivial annoyances" and anything that is not reasonably likely to deter employees from engaging in protected activity. The EEOC does not explain how it justifies excluding such discriminatory acts under its strictly literal reading of the statute, which prohibits discrimination without any explicit textual limitation regarding the type of discrimination or level of severity required. Therefore, the EEOC admits that a strictly literal reading of "discriminate against" is not a fair interpretation of Title VII since it is unlikely that Congress intended to authorize Title VII claims over trivial matters.

We developed the adverse-employment-action element to prevent the kind of claims based upon trivial employment actions that a strictly literal reading of Title VII's anti-retaliation provision would allow. Because the language of Title VII does not explicitly provide any limit on the types of discriminatory acts prohibited, the language of Title VII does not favor the EEOC's proposed limitations over the limitations this court has developed during the last twenty years of defining the adverse-employment-action element of a Title VII claim.

The EEOC argues that the purpose of Title VII's anti-retaliation provision supports its definition. "In enacting section 2000e-3, Congress unmistakably intended to ensure that no person would be deterred from exercising his rights under Title VII by the threat of discriminatory retaliation." *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 543 (6th Cir. 1993). While the EEOC's proposed definition more overtly incorporates the purpose of Title VII's anti-retaliation

---

(2d ed. 1989) ("to discriminate against: to make an adverse distinction with regard to; to distinguish unfavorably from others").

provision, this court's definition, properly interpreted, also accomplishes the goal while appropriately counterbalancing the need to prevent lawsuits based upon trivialities. Instead of requiring district courts to determine on a case-by-case basis what actions by an employer are reasonably likely to deter an employee from engaging in protected activity, we have over the last twenty years given some shape to the definition by describing the kinds of material adverse employment actions that rise above the level of trivial. As we recognized in *Kocsis*, however, it is impossible to list every possible employment action that falls into the definition of adverse employment action and a court must consider "indices that might be unique to a particular situation." *Kocsis*, 97 F.3d at 886.

In addition, this court's definition has the benefit of applying equally to all Title VII discrimination claims, not only to retaliation claims. Having a different standard for different provisions of Title VII would be burdensome and unjustified by the text of the statute, which uses the same phrase "discriminate against" in each of its anti-discrimination provisions. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791-92 (6th Cir. 2000) (applying rules of statutory construction to hold that "discriminate against" means the same thing each time it appears in Title VII); *Mattei v. Mattei*, 126 F.3d 794, 806 (6th Cir. 1997) (presuming that Congress intended the phrase "discriminate against" to have the same basic meaning each time it is used in a statute).[5]

---

[5]Although both § 2000e-2(a)(1) and § 2000e-3(a) use the phrase "discriminate against," the former specifies that the prohibited discrimination must be "with respect to his compensation, terms, conditions, or privileges of employment," while the anti-retaliation provision contains no such language. The parties dispute whether this additional language is a limitation or an expansion of the conduct prohibited. We have never before distinguished between the types of conduct prohibited in the different provisions, and we do not do so here.

We therefore reject White's and the EEOC's request that we adopt a new definition of adverse employment action for purposes of Title VII retaliation cases, and we reaffirm the definition that we have developed in cases such as *Kocsis* and its progeny.  Since the adverse-employment action element developed by this Circuit is an exception to a broad, strictly literal reading of Title VII's anti-discrimination provisions, we will continue to define the exception narrowly so as not to frustrate the purpose of Title VII while deterring lawsuits over trivial matters.

**B.  Suspension Without Pay**

We now apply our definition of adverse employment action to the actions at issue in the present case.  We consider the suspension first.   Burlington Northern argues that a suspension without pay, followed thirty-seven days later by

We find it untenable to interpret the additional language as an expansion of prohibited conduct because "with respect to" is a phrase commonly used to limit. *But cf. Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 709 (5th Cir. 1997) ("The anti-retaliation provision speaks only of 'discrimination'; there is no mention of the vague harms contemplated in § 2000e-2(a)(2).  Therefore, this provision can only be read to exclude such vague harms, and to include only ultimate employment decisions."). The D.C. Circuit and the United States District Court for the Northern District of Ohio have written well-reasoned opinions that conclude that the absence of the additional language from the anti-retaliation provision means that an employer is prohibited from retaliating in materially adverse ways, regardless of whether the retaliatory acts affect employment. *Passer v. American Chem. Soc.*, 935 F.2d 322, 330-31 (D.C. Cir. 1991) (holding that an employer's cancellation of a major public symposium in former employee's honor could be an act of retaliation under a statute that parallels Title VII's anti-retaliation provision); *EEOC v. Outback Steakhouse of Florida, Inc.*, 75 F.Supp.2d 756, 758-60 (N.D. Ohio 1999) (holding that Title VII's anti-retaliation provision is not limited to discrimination affecting employment).  It is unnecessary for us to resolve the question addressed in *Passer* and *Outback Steakhouse* because the actions at issue in the present case (job transfer and suspension) clearly affect employment.

a reinstatement with back pay, is not an adverse employment action.   For this argument, Burlington Northern primarily relies upon *Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542 (6th Cir. 1999).

In May 1994, a Vanderbilt University dean denied tenure to Professor Dobbs-Weinstein and advised her that her teaching appointment at Vanderbilt would end on August 31, 1995.   *Id.* at 543.   Dobbs-Weinstein filed an internal grievance with Vanderbilt, alleging gender and national-origin discrimination among other things, and in May 1995, she filed an action under Title VII. *Id*. On August 31, 1995, her employment contract with Vanderbilt ended.  *Id.* at 544. In November 1995, while her lawsuit was still pending, the Vanderbilt Board of Trustees reversed the decision of the dean and rehired her as a tenured professor. *Id.* The board also granted her back pay to account for the delayed promotion and the period of unemployment. *Id.* Dobbs-Weinstein persisted with her lawsuit, however, seeking interest on the back pay and compensation for emotional distress and injury to reputation. *Id.*

Despite the facts that she was initially denied tenure and her employment ended temporarily, this court held that Dobbs-Weinstein had not suffered an adverse employment action cognizable under Title VII. *Id.* at 545. We recognized that "'tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally.'" *Id.* (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92-93 (2d Cir. 1984)). We relied upon the fact that Vanderbilt reversed the decision of its dean and granted Dobbs-Weinstein back pay as the result of its internal grievance procedure. *Id.* This reversal, we reasoned, was the "ultimate employment decision." *Id.* We held that "intermediate" tenure decisions that are appealable through a tenure review process cannot form the basis of a Title VII claim. *Id.* We did not, however, cite any section of Title VII that requires exhaustion of internal grievance procedures

before one files a lawsuit.[6]  Instead, we relied upon a decision from the Fourth Circuit, *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981), which we interpreted as holding that Title VII applies only to "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating."  *Id.*  Neither the Fourth Circuit nor the *Dobbs-Weinstein* court, however, cited a statutory provision that limits Title VII's application to ultimate employment decisions.

Since deciding *Page*, the Fourth Circuit has retreated from the "ultimate employment decision" standard. *Von Gunten v. Maryland*, 243 F.3d 858, 865, 866 n.3 (4th Cir. 2001) (limiting *Page* and holding that "'ultimate employment decision' is not the standard in this circuit").  Furthermore, the majority of other circuits have either implicitly or explicitly rejected a standard limiting Title VII's reach to ultimate employment decisions.  *See id.* at 864, 866 n.4 (citing cases).  Indeed, the only other circuits where this standard even arguably has any viability are the Fifth and the Eighth. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (applying the "ultimate employment decision" standard); *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) (same).

The Fifth Circuit, however, has questioned whether the "ultimate employment decision" standard survived the Supreme Court's pronouncements in *Burlington Industries* regarding the definition of tangible employment action. *Fierros v. Texas Dep't of Health*, 274 F.3d 187, 192-93 & n.2 (5th Cir. 2001) (pretermitting question); *but see Hernandez v.*

---

[6]In fact, as will be mentioned again below, the Supreme Court has pointed out to this court before that internal grievance procedures and an action under Title VII are "legally independent" such that the statute of limitations on a Title VII claim is not tolled during the pendency of an internal grievance process. *Int'l Union of Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 236 (1976) (reversing a Sixth Circuit decision).

*Crawford Bldg. Material Co.*, 321 F.3d 528, 531 (5th Cir. 2003) (applying "ultimate employment decision" standard without discussing *Burlington Industries* or *Fierros*).  And while the Eighth Circuit has ostensibly adopted the "ultimate employment decision" standard, it has consistently applied a broader standard. *See, e.g., Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997) (ultimate employment decision includes "tangible change in duties or working conditions that constituted a material employment disadvantage"); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (ultimate employment decision includes reduction of duties, actions that disadvantage or interfere with the employee's ability to do his or her job, "papering" of an employee's file with negative reports and reprimands even though employee was "not discharged, demoted, or suspended").

We now join the majority of other circuits in rejecting the "ultimate employment decision" standard.[7]  First and foremost, it is contrary to the plain language of Title VII, which provides that an employer must not "discriminate against" an employee based upon a prohibited classification. As this court has found, the words "discriminate against" literally mean "*any kind* of adverse action." *Mattei*, 126 F.3d at 805.  Congress could have provided that employers shall not "discriminate against an employee when making ultimate

---

[7]We recognize that our decision in *Dobbs-Weinstein* was based in part upon the unique nature of "tenure decisions in an academic setting." 185 F.3d at 545.  Other circuits also have acknowledged the unique nature of tenure decisions. *See Tanik v. S. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997); *Brousard-Norcross v. Augustana Coll. Ass'n*, 935 F.2d 974, 976 (8th Cir. 1991); *Kumar v. Bd. of Trs., Univ. of Mass.*, 774 F.2d 1, 11 (1st Cir. 1985); *Zahorik*, 729 F.2d at 92-93 (2d Cir. 1984).  Because we are not presented here with a denial of tenure, we do not decide to what extent our holding in *Dobbs-Weinstein* survives our decision in this case.

employment decisions," but instead it chose to use the words "discriminate against" with no such qualifier.

Second, the employment action taken in the present case (suspension without pay for thirty-seven days) is not the type of employment action that this court developed the adverse-employment-action element to filter. The adverse-employment-action element is a warranted judicial interpretation of Title VII intended to deter discrimination lawsuits based on trivial employment actions, such as those that cause a "mere inconvenience" or a "bruised ego." *Kocsis*, 97 F.3d at 886. But as an exception to the strictly literal reading of the statute, the adverse-employment-action element of a Title VII lawsuit must not be interpreted too broadly. Taking away an employee's paycheck for over a month is not trivial, and if motivated by discriminatory intent, it violates Title VII. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001) (holding that a suspension without pay for one week was an adverse employment action even though the employee was later reimbursed for lost wages because the employee "suffered the loss of the use of her wages for a time").

Third, the "ultimate employment decision" standard contravenes "the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975). While the standard ensures that a wrongfully suspended employee eventually receives back pay, it allows an employer unilaterally to cut off the employee's claims for other damages, which have been explicitly authorized by Title VII since the Civil Rights Act of 1991, such as interest on the back pay, attorney's fees, emotional suffering, and punitive damages. 42 U.S.C. §§ 1981a(b); 2000e-5(g), (k). Although Burlington Northern argues that it made White whole when it granted her back pay, Congress has declared that part of making a Title VII plaintiff whole is compensating her for interest on the back

pay, attorney's fees, and emotional suffering. In this case, the jury found that White had suffered $43,500 in damages other than back pay due to Burlington Northern's retaliation.

Lastly, the "ultimate employment decision" standard is in tension with Supreme Court cases holding that the statute of limitations on a Title VII claim is not tolled during the pendency of an internal grievance process. *See, e.g., Int'l Union of Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 236 (1976). According to the Supreme Court, a Title VII claim arises on the date the alleged discriminatory decision occurs, even though an employee has challenged the decision via an internal grievance process. *Id.* at 234. The Supreme Court has rejected the argument that the pendency of an internal grievance process renders the employment decision "tentative" or "non-final" for purposes of Title VII. *Id.* The Supreme Court has also rejected the argument that "the danger of possible conflict between the concurrent pursuit of both collective-bargaining and Title VII remedies should result in tolling the limitations period for the latter while the former proceeds to conclusion." *Id.* at 239. The alleged discriminatory decision in the present case was the suspension without pay. White's election to challenge this decision through an internal grievance process does not render the decision not actionable under Title VII.

The Equal Employment Advisory Council (the EEAC) argues in its *amicus curiae* brief on behalf of Burlington Northern that employers must maintain the prerogative to suspend summarily employees suspected of wrongdoing pending an investigation without facing the risk of Title VII liability. Otherwise, according to the EEAC, employers will be faced with the dilemma of either allowing potentially dangerous or disruptive individuals to remain in the workplace or suspending them pending an investigation, thereby risking Title VII liability.

In response to the EEAC's concerns, we initially note that an employer taking an adverse employment action against an employee, including a suspension without pay, only risks Title VII liability if there exists sufficient evidence to prove that the employer took the action based upon illegal discrimination. To the extent the EEAC's concerns for an employer's risk of Title VII liability are valid, however, they are allayed by *Jackson v. City of Columbus*, which holds that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action. 194 F.3d 737, 752 (6th Cir. 1999). In *Jackson*, we held that there was no adverse employment action when a mayor effectively suspended with pay a police chief for four days pending an investigation of the police chief's alleged improper conduct in office. *See id.* at 744 (noting that the mayor referred to the suspension with pay of the police chief as a reassignment "to his residence").[8]

## C. Job Transfer

Next we consider whether the job transfer at issue in the present case was an adverse employment action. Burlington Northern appeals the district court's decision that transferring White from her forklift operator job to a standard track laborer job was an adverse employment action. We agree with the district court.

While the standard track laborer job paid the same as the forklift operator position, White's new position was by all accounts more arduous and "dirtier." Furthermore, the forklift operator position required more qualifications, which is an indication of prestige. *See Kocsis*, 97 F.3d at 886-87

---

[8]The National Employment Lawyers Association in its *amicus curiae* brief on behalf of White concedes that a suspension with pay pending a timely, good-faith investigation does not constitute an adverse employment action and recommends this course to employers concerned about possible misconduct.

(finding that the plaintiff had failed to show an adverse employment action because, among other things, her job reassignment did not entail any loss in prestige). According to Burlington Northern's own witnesses, the transfer occurred because the forklift operator position was objectively considered a better job and the male employees resented White for occupying it. In essence, as the district court found, the reassignment was a demotion evidenced by "indices . . . unique to [the] particular situation." *Kocsis*, 97 F.3d at 886; *see also Burlington Indus., Inc.*, 524 U.S. at 761 (defining "tangible employment action" for purposes of Title VII liability as including a job "reassignment with significantly different responsibilities"); *Mattei*, 126 F.3d at 808 (stating that transferring an employee at the same salary to "some wretched backwater" is "clearly" actionable in a retaliation claim).

## D. Evidence of Pretext

Having rejected Burlington Northern's arguments that there was no adverse employment action taken against White, we now address Burlington Northern's alternative argument in support of reversing the district court's denial of its motion for judgment as a matter of law. Burlington Northern appeals the district court's decision that there was sufficient evidence from which the jury reasonably concluded that Burlington Northern's asserted legitimate, non-discriminatory reasons for removing White from the forklift position and then suspending her were pretexts for unlawful retaliation. We agree with the district court.

White presented to the jury substantial evidence to contradict Burlington Northern's asserted legitimate reasons, including contradictory statements from Burlington Northern's own officers. Burlington Northern asserted one reason for transferring White in its interrogatory response, but then Brown, the official who made the decision to transfer White, asserted a different, contradictory reason at trial.

Furthermore, Brown testified that he transferred White in part based upon complaints from Ellis, but at trial Ellis denied complaining about White.  Regarding the suspension, the evidence was not even consistent regarding who made the decision, much less the motivation for the decision.  Brown testified that Sharkey made the decision to suspend White, while Sharkey testified that Brown made the decision.  Burlington Northern asserts that Brown suspended White for insubordination, but another Burlington Northern official who served as a hearing officer for White's internal grievance concluded that White had not been insubordinate.  White's second EEOC charge accused Brown of violating Title VII, and White was suspended three days after this charge was mailed to Brown.

Based upon all the evidence, including the contradictory evidence from Burlington Northern's own officers, the jury was entitled to find that Burlington Northern's asserted legitimate reasons were false and were pretext for unlawful retaliation.  *See Reeves*, 530 U.S. at 147 (holding that a jury is entitled to treat a party's dishonesty about a material fact as evidence of culpability).

### III.  ATTORNEY'S FEES

Burlington Northern's last issue on appeal is a challenge to the amount the district court awarded White in attorney's fees.  The district court awarded White eighty percent of her attorney's fees based on her degree of success in the lawsuit.  Burlington Northern argues that White was not as successful as the district court found and that her attorney's fee award should be reduced.

We review a district court's determination regarding the amount of an award of attorney's fees under Title VII for an abuse of discretion.  *Scales v. J.C. Bradford and Co.*, 925 F.2d 901, 909 (6th Cir. 1991).  "This deference, 'is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).  Under Title VII, a district court has discretion to award a prevailing party "a reasonable attorney's fee." 42 U.S.C. § 2000e-5(k).  In determining what constitutes a reasonable attorney's fee, the degree of success achieved in the lawsuit is a crucial factor.  *Scales*, 925 F.2d at 910.

Although we may have awarded a different amount if we were considering the issue *de novo*, we do not find that the district court abused its discretion in awarding White eighty percent of her attorney's fees.  White brought two claims in this lawsuit (sex discrimination and retaliation) but only prevailed on one (retaliation).  As the district court correctly stated in its written decision, however, both of these claims arose from a common set of facts, and it would be difficult to divorce work done on one claim from work done on the other.  In light of this consideration and others addressed by the district court in its decision, we find that the district court did not abuse its discretion in awarding White eighty percent of her attorney's fees.

## IV.  PUNITIVE DAMAGES

In her cross-appeal, White asserts that the district court erred in charging the jury on punitive damages.  The district court instructed the jury that punitive damages may be considered if White showed by "clear and convincing" evidence that Burlington Northern acted "either intentionally, recklessly, maliciously, or fraudulently."  The jury did not award White punitive damages.  White contends that the appropriate burden of proof on a claim for punitive damages under Title VII is a preponderance of the evidence, not clear and convincing evidence.  White is correct.

According to Title VII, "[a] complaining party may recover punitive damages under this section against a respondent . . . if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1998) (discussing what a plaintiff must prove to recover punitive damages under Title VII).  Title VII is silent concerning the evidentiary standard for demonstrating malice or reckless indifference for purposes of a punitive damages claim.  In the absence of more specific guidance, "[c]onventional rules of civil litigation generally apply in Title VII cases, and one of these rules is that parties to civil litigation need only prove their case by a preponderance of the evidence." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989) (plurality decision) (internal citation omitted); *see also Desert Palace, Inc. v. Costa*, 123 S.Ct. 2148, 2154 (2003) (holding that Title VII's silence with respect to an evidentiary standard suggests that a conventional preponderance of the evidence standard applies).

Other circuits have reached this same conclusion with respect to punitive damages claims generally, *see Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 282-83 (2d Cir.

1990) (declining to apply a higher standard of proof than preponderance of the evidence for punitive damages award in products liability case because "such a change is best left for Congress or for higher judicial authority"); *In re Exxon Valdez*, 270 F.3d 1215, 1232 (9th Cir. 2001) (applying preponderance standard to award of punitive damages in maritime case because Congress has not legislated a higher standard), and with respect to punitive damages in Title VII suits, *see Karnes v. SCI Colorado Funeral Servs., Inc.*, 162 F.3d 1077, 1080-82 (10th Cir. 1998) (concluding that a preponderance of the evidence standard is applicable to claims for punitive damages under Title VII); *Notter v. N. Hand Prot.*, No. 95-1087, 1996 WL 342008, at *10-11 (4th Cir. June 21, 1996) (rejecting argument that the standard of proof for punitive damages in Title VII case is clear and convincing evidence because "[i]n discrimination cases brought under federal law, punitive damages need be proven only by a preponderance of the evidence").

The dissenting opinion states that punitive damages are an unconventional form of relief and therefore deserve a heightened standard of proof.  Unquestionably, punitive damages serve a different purpose than compensatory damages.  The requirement that punitive damages be awarded only when a defendant acts maliciously or recklessly recognizes this difference in purpose and ensures that punitive damages will be awarded only in the most egregious cases.  Punitive damages are not, however, unconventional in the sense that they are a new or nontraditional form of relief.  In fact, punitive damages have a long history in American civil litigation, where the traditional standard of proof has been "preponderance of the evidence."  *See generally Jury Determination of Punitive Damages*, 110 Harv. L. Rev. 1513, 1531-32 (1997) (recognizing that preponderance of the evidence is the traditional civil standard of proof). *Cf. Smith v. Wade*, 461 U.S. 30, 53-56 (1983) (noting that "[t]here has never been any general common-law rule that the threshold for punitive damages must always be higher than that for

compensatory liability" and rejecting actual malicious intent requirement for punitive damage award in § 1983 cases, even when underlying standard of liability for compensatory damages is recklessness).

The dissent, unable to point to any precedent imposing a higher standard of proof for Title VII punitive damages claims than preponderance of the evidence, also relies on authority not directly germane to the issue at hand. For instance, the dissent notes that, in recent years, public policy concerns, primarily about excessive punitive damage awards, have prompted many states to adopt a "clear and convincing" standard of proof for punitive damages. Trends at the state level, however, do not inform our consideration of punitive damages claims under the federal Title VII statute. In fact, the dissent's statistics indicate that, while many states applied a heightened standard of proof to state punitive damage claims at the time that Title VII was amended to permit such claims in 1991, a *majority* of states at that time chose not apply a heightened standard.

Moreover, to the extent that concerns about excessive punitive damage awards prompted the adoption of heightened standards of proof before or after 1991, those concerns do not exist under the Title VII statutory scheme. Under Title VII, damage awards – both compensatory and punitive – are capped, with $300,000 being the largest sum that can be awarded to a claimant against the largest employers, those with 500 or more employees.[9] 42 U.S.C. § 1981a(b)(3)(D). The $300,000 limit is imposed on the sum of the compensatory and punitive damage awards; there is no separate limit for each type of damages. 42 U.S.C. § 1981a(b)(3). Thus, Title VII's own quite substantial

---

[9] The limits are lower for smaller employers, with the lowest limit being $50,000 for employers with 15-100 employees. 42 U.S.C. § 1981a(b)(3)(A)-(D).

restrictions on punitive damage awards guard against excessive awards.

Besides identifying trends at the state level, the dissent also cites cases that involve due process challenges to the application of a preponderance of the evidence standard of proof. Some of these cases concern situations wholly unrelated to punitive damages claims. *See Addington v. Texas*, 441 U.S. 418, 431-33 (1979) (resolving, in the face of a due process challenge, the standard of proof required in a civil commitment hearing); *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) (determining the standard of proof that due process demands in the context of a parental rights termination proceeding). Other cases cited by the dissent implicate a due process challenge to large punitive damage awards. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S. Ct. 1513, 1519-20 (2003); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19 (1991). While the Supreme Court has found excessive punitive damages awards to be violative of due process, *State Farm*, 123 S. Ct. at 1526, the Court has specifically rejected the notion that the Due Process Clause requires a higher standard of proof for punitive damages claims than preponderance of the evidence. *Pacific Mut. Life Ins.*, 499 U.S. at 23 n.11. The sole bit of assistance derived from any of these cases is the Court's direct rejection in *Pacific Mutual* of the notion that the Constitution requires a standard of proof any higher than preponderance of the evidence for punitive damages claims.

The only case relied on by the dissent that could be instructive is *Woodby v. INS*, 385 U.S. 276 (1966), where the Supreme Court considered the standard of proof for a deportation hearing. As in the instant case, the Court in *Woodby* was confronted with determining the standard of proof when "Congress has not addressed itself to the question of what degree of proof is required . . . ." *Id*. at 284. In *Woodby*, the Court held that for deportation proceedings, the standard of proof was "clear, unequivocal, and convincing

evidence," *id*. at 286, which the dissent apparently references for the proposition that we should apply the same standard of proof here.  While *Woodby* is helpful in its reminder that the judiciary has traditionally resolved the question of the proper standard of proof under a federal statute when Congress has not addressed the issue, *id*. at 284, it gives us no direction in this case.  Its reasoning is based on the immediate hardship of deportation.  Deportation, as an outcome of an administrative and judicial proceeding, bears little similarity to an award of damages, particularly an award under Title VII, which Congress has carefully restricted to limit its potential harm to employers.

Accordingly, in determining the proper standard of proof for a punitive damage claim under Title VII, we receive no specific guidance from the statutory language of the Act.  Supreme Court precedent offers some assistance, however.  Deriving that guidance from *Price Waterhouse* and *Desert Palace* – both of which specifically discuss standards of proof in Title VII cases – is more appropriate than looking to the Supreme Court's views on the standard of proof in dissimilar contexts or its stray comments about state or federal standards of proof in the course of deciding other issues.  While there have been developments concerning the standard of proof for punitive damages claims at the state level, these trends do not support the conclusion that the "clear and convincing" standard applies to federal punitive damage claims under Title VII, which has its own limitations on punitive damage awards.  Furthermore, as this case does not implicate a due process challenge to the size of a punitive damages award, or to the standard of proof used in civil commitment hearings, hearings terminating parental rights, or in the context of deportation, we do not find the dissent's cited authority to be persuasive.  Rather – in deciding the standard of proof to be applied to plaintiff's claim for punitive damages under Title VII – we choose to follow the guidance provided by the Supreme Court that "[c]onventional rules of civil litigation

generally apply in Title VII cases."  *Price Waterhouse*, 490 U.S. at 253.

Therefore, the district court erred when it instructed the jury that White must prove her case for punitive damages by clear and convincing evidence.  The district court, however, also erred when it instructed the jury that White only needed to prove that Burlington Northern acted "either intentionally, recklessly, maliciously, or fraudulently."  As noted above, a plaintiff seeking punitive damages under Title VII must prove that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  This standard requires a plaintiff to prove more than merely intentional discrimination.  *Kolstad*, 527 U.S. at 536-37 (explaining standard).  In addition, the Supreme Court has stated that only under certain conditions may an employer be vicariously liable for punitive damages under Title VII.  *Id.* at 545 (specifying conditions).

Finally, the dissent questions whether plaintiff has presented sufficient evidence to submit the punitive damages issue to a jury under either standard and would resolve the issue in defendant's favor without remand.  While defendant argues generally that plaintiff's evidence was insufficient to permit an award of punitive damages, the parties did not analyze the evidence with any specificity under either potentially applicable standard of proof in their briefing to this court.  Nor have we focused on the sufficiency of the evidence to permit a punitive damage award, since this was not the reason we granted an *en banc* hearing.  We cannot find that the evidence is insufficient on a damage issue simply because judicial officers may disagree on an issue relating to liability, as the dissent suggests.  Rather, in order to decide whether a trier of fact could award punitive damages in this case, a careful examination of the entire record is required.  This exercise is most appropriately undertaken in the first instance by the district court.  If the district court determines on remand that the evidence is sufficient to support a claim

for punitive damages under the standard announced by the Supreme Court in *Kolstad*, then the district court should conduct a new trial on the issue of punitive damages only.

## V. CONCLUSION

For all these reasons, we affirm the district court's denial of Burlington Northern's motion for judgment as a matter of law and the district court's award of attorney's fees to White. We conclude, however, that the district court erred in instructing the jury on the issue of punitive damages, and therefore we remand the case for further proceedings consistent with this opinion.

---

## CONCURRENCE

---

CLAY, Circuit Judge, concurring. I join Parts I, III, and IV of the majority opinion. I also agree with Part II insofar as it rejects the untenable "ultimate employment action" doctrine, concludes that Sheila White's removal from her forklift position and her thirty-seven-day suspension constitute adverse employment actions within the meaning of Title VII, and affirms the district court's denial of Burlington's Rule 50 motion. Although the majority properly rejected the "ultimate employment action" doctrine this court embraced in *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545-46 (6th Cir. 1999), I would be remiss if I failed to point out that such an express rejection of the "ultimate employment action" doctrine effectively overrules *Dobbs-Weinstein*. I write separately, however, because I disagree with the rule the majority today embraces with respect to what constitutes an adverse employment action within the meaning of Title VII's anti-retaliation provision, 42 U.S.C. 2000e-3(a). Instead, I believe that the appropriate standard is the one articulated in the Ninth Circuit and advocated by the EEOC; i.e., an employer's retaliatory action is sufficiently adverse for § 704(a) purposes if it would be "reasonably likely to deter [employees] from engaging in protected activity." *Ray v. Henderson,* 217 F.3d 1234, 1242-43 (9th Cir. 2000). The "reasonably likely to deter" standard is more consistent with § 704(a)'s statutory language and congressional intent, as well as Supreme Court case law.

## A.  Why the "Reasonably Likely to Deter" Rule  is the Appropriate Standard for a Retaliation Case

### 1.  *Statutory and Case Law Support*

The Supreme Court has repeatedly instructed courts, as a first step in interpreting a statute, "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, (1997).  The inquiry is at an end "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"  *Id.* (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240 (1989)). It is readily apparent from a reading of § 704(a) that Congress placed no limitations on the reach of the anti-retaliation provision.

Section 704(a) states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter."   42 U.S.C.  § 2000e-3(a).   The word "discriminate," in turn, is not defined in Title VII, but the scope is impliedly quite broad.  A review of other Title VII provisions is revealing, inasmuch as § 703(a) prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise *to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added).   Thus, both §§ 703(a) and 704(a) use the term "discriminate," but only the general discrimination provision (§703(a)) places limitations on the word "discriminate."  Congress chose not to place any limitations on "discriminate" within the meaning of § 704(a). Thus, a straightforward reading of the § 704(a)'s plain text makes clear that there is no statutory support for the idea that

a decision to undertake retaliatory action must materially affect the terms and conditions of employment in order to violate its proscriptions.  Indeed, the most natural reading of this language is that it prohibits any form of discrimination against an individual for opposing discrimination or filing a charge, regardless of whether that discrimination takes the form of, for example, termination, suspension, lateral transfer, harassment, or discipline.  At least some of the circuits have expressly agreed.  *Smith v. Sec'y of Navy,* 659 F.2d 1113, 1119 n.56 (D.C. Cir. 1981) (noting that the language of the anti-retaliation provision "speaks unconditionally" and is not "limit[ed] to acts causing particular harms such as the loss of a particular job or promotion"); *Ray,* 217 F.3d at 1243 (noting that language of the anti-retaliation provision "does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination"); *Knox v. State of Indiana,* 93 F.3d 1327, 1334 (7th Cir. 1996) ("There is nothing in the law of retaliation that restricts the type of retaliatory acts that might be visited upon an employee . . . .").

Incorporating by reference the limitations placed on "discriminate" in § 703(a) into "discriminate" in § 704(a) is altogether inappropriate.  Such incorporation by reference is appropriate only when it is consistent with Congress' expressed intent. Section 704(a)'s legislative history is scant, and therefore we are left to look to its plain legislative text. Congress could quite easily have placed the same limitation on § 704(a) as it did on § 703(a), yet it chose not to do so. Congress' legislative intent, by all indications, was to remove all obstacles from an employee's ability to defend his or her Title VII rights by filing EEOC charges.

The Supreme Court, in *Russello v. United States*, confirmed its view against narrowly construing the meaning of a statute when the plain language unambiguously expressed its legislative purpose and intent.  464 U.S. 16, 23 (1983).  In determining the proper applicability of the word "interest" as

used in 18 U.S.C. §1963(a)(1) in the context of a RICO case, the Supreme Court held that "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello*, 464 U.S. at 23 (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972). Specifically, in discussing the particular statutory provision at issue, the Court noted that "[t]he argument for a narrow construction of § 1963(a)(1) is refuted by the language of the succeeding subsection (a)(2). The former speaks broadly of 'any interest . . . acquired,' while the latter reaches only 'any interest in . . . any enterprise which [the defendant] has established[,] operated, controlled, conducted or participated in the conduct of in violation of section 1962.'" *Id*. (quoting 18 U.S.C. § 1962). The Court went on to express its belief that if Congress had intended to restrict § 1963 (a)(1), it presumably would have done so expressly as it did in the immediately following subsection. *Id*.

Contrary to the majority opinion, this Court has already embraced this logic. In *Lynch v. Johns-Manville Sales Corp.*, we held that when looking to stay proceedings in a Chapter 11 bankruptcy context, a solvent co-defendant may not use the automatic stay provision in 11 U.S.C. § 362(a), when the said provision facially stays proceedings "against the debtor," and fails to suggest that these rights may be invoked by any one other than the defendant. 710 F.2d 1194, 1198 (6th Cir. 1983). The Court noted "[it] is a fundamental rule of statutory construction that inclusion in one part of a congressional scheme of that which is excluded in another part reflects a congressional intent that the exclusion was not inadvertent." *Id*. at 1197.

The Supreme Court case, *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997), views § 704(a)'s legislative intent in this manner. In *Robinson,* the plaintiff sued his former employer, alleging that it had retaliated against him by giving

him a negative employment reference to a potential employer. *Id*. There was no allegation that the former employer itself had made an ultimate employment decision, or that it took any adverse action that materially altered the plaintiff's job responsibilities. (Indeed, it could not have done so, given that the plaintiff was no longer working for the employer at the time.) Nevertheless, a unanimous Court allowed the plaintiff's claim to proceed after holding that former employees may challenge retaliatory actions. *Id.* at 346. Although *Robinson* dealt specifically with the issue of determining who is an "employee" for purposes of Title VII's anti-retaliation provision (as opposed to what constitutes an adverse employment action), its reasoning is pertinent: a former employee counts as an employee within the meaning of § 2000e-3(a), because otherwise an employee could be fired in retaliation and not be able to sue. In so holding, the Court noted that an alternative statutory interpretation would have undermined or vitiated one of Title VII's most important purposes–maintaining "unfettered access to statutory remedial mechanisms." *Id*.

In line with the teachings of *Robinson* and the Supreme Court's view that § 704(a) should not be limited in its construction, this Court, in *EEOC v. Ohio Edison*, also interpreted § 704(a) to be a broad anti-retaliation provision that should reach as far as its intended protections allow. 7 F.3d 541, 545-46 (6th Cir. 1993) (holding that Title VII's protections against retaliation extended to situations where an employee was discriminated against because his representative opposed an unlawful employment practice). In reaching this result, we stated that "[i]n enacting section 2000e-3, Congress unmistakably intended to ensure that no person would be deterred from exercising his rights under Title VII by the threat of discriminatory retaliation." *Id*. at *543*. We relied, in part, on the Supreme Court's analysis of statutory interpretation in *NLRB v. Scrivener*, which held that "the language of a statute should not be read strictly, but should 'be read more broadly' if such a reading was also

consistent with the 'purpose and objective' of the prohibition made illegal by the statute." *Id*. at 545 (quoting *NLRB v. Scrivener*, 405 U.S. 117, 122 (1972)).

Additionally in *Mattei v. Mattei*, this Court once again chose to interpret the Title VII's anti-retaliation provision broadly, as to prohibit *any kind* of adverse action.  126 F.3d 794, 798 (6th Cir. 1997).  There, we were asked to give meaning to the concept of discrimination as it is used in the Employee Retirement Income Security Act ("ERISA").  *Id.* The ERISA provision at issue was § 510 which made it unlawful, under certain circumstances, to "discriminate against" a participant or beneficiary.  *Id*. at 797 (quoting 29 U.S.C § 1140).  The majority found guidance in Title VII's and the ADEA's interpretive use of the phrase "discriminate against," noting that neither of these Acts defined this phrase, but rather their respective provisions "are consistently interpreted . . . to forbid an employer to take *any kind* of adverse action against an individual because he has engaged in [] protected activity . . . ." *Id*. at 806 (emphasis in original). We concluded that because the ERISA anti-retaliation provision at issue used the same phrase ("discriminate against") as the Title VII and ADEA provisions, and was enacted after them, it was proper to assume that Congress intended for the ERISA provision "to have the same basic meaning." *Id*. at 806.

Even more recently, the Supreme Court has cautioned courts against unwarranted limitations on otherwise unambiguous statutory text.  In *Desert Palace, Inc. v. Costa,* the Supreme Court rejected the approach of many circuits to limit a Title VII plaintiff's ability to receive a mixed-motive jury instruction in cases where direct evidence of discrimination had not been submitted at trial, determining that a "direct evidence" requirement "is inconsistent with the text of [42 U.S.C. § 2000e-2(m)]." 123 S.Ct. 2148, 2153 (2003).  The Court reasoned, in pertinent part, that the § 2000e-2(m) "unambiguously states that a plaintiff need only

'demonstrat[e]' that an employer used a forbidden consideration with respect to 'any employment practice.'" *Id.* On its face, "the statute does not mention, much less require, that a plaintiff make a heightened showing through direct evidence." *Id.*  The Court was further persuaded by a review of the term "demonstrates," which Title VII, as amended in the 1991 Civil Rights Act, defined as "to 'mee[t] the burdens of production and persuasion.'" *Id.* at 2154 (citing 42 U.S.C. § 2000e(m)).  The Court added, "If Congress intended the term 'demonstrates' to require that the 'burdens of production and persuasion' be met by direct evidence or some other heightened showing, it could have made that intent clear by including language to that effect in § 2000e(m).  Its failure to do so is significant, for Congress has been unequivocal when imposing heightened proof requirements in other circumstances, including in other provisions of Title 42." *Id.* at 2154.  *Desert Palace* is instructive, inasmuch as it cautioned courts not to read limitations into statutory language, particularly where Congress expressly limited such terms in other provisions of the same title yet declined to do so in the presently reviewed statutory provision.  We are faced with precisely the same situation.  Section 703(a) expressly limited the scope of "discriminate" to actions relating to the employee's "compensation, terms, conditions, or privileges of employment."  Section 704(a) could just as easily have limited its scope of "discriminate," yet chose not to do so.  It is abundantly clear that the lessons of *Desert Palace* dictate that we not read such limitations into § 704(a) now.

### 2. *Administrative Agency Support*

In addition to support from the statutory text and Supreme Court case law, there is administrative agency support for the "reasonably likely to deter" view, inasmuch as the EEOC has interpreted 42 U.S.C. § 2000e-3 in this manner.  While it is true that the EEOC Compliance Manual on Retaliation is not binding authority, the guidelines nevertheless "constitute a

body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65 (1986) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)). It is persuasive authority. According to the EEOC, an "adverse employment action" means "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998). Under this approach, a number of retaliatory actions which are not expressly encompassed in a "materially adverse" standard would fall into the ambit of a § 704(a) violation, so long as they are reasonably likely to deter employees from engaging in protected activity. The EEOC's test is not unlimited however, for instance, "petty slights and trivial annoyances are not actionable, as they are not likely to deter protected activity." EEOC Compliance Manual Section 8, "Retaliation," 8-14. As the Ninth Circuit observed, the focus is not on the "ultimate effects of each employment action," but rather on the "deterrent effects." *Ray,* 217 F.3d at 1243. Given the primary purposes of Title VII's anti-retaliation provision, this is where the emphasis properly lies.

### 3. Policy Considerations

From a policy (and logical) perspective, many factors support an interpretation of adverse employment action that extends beyond the boundaries of an employment decision that materially affects the terms and conditions of employment.

As noted above, a "materially adverse" standard would undermine the driving force behind § 704(a), which is to maintain "unfettered access to statutory remedial mechanisms." *Robinson,* 519 U.S. at 346. This Court has similarly observed that Congress, in enacting Title VII's anti-retaliation provision, "'unmistakably intended to ensure that no person would be deterred from exercising his rights under

Title VII by the threat of discriminatory retaliation.'" *EEOC v. Ohio Edison Co.,* 7 F.3d 541, 543 (6th Cir. 1993).

Indeed, the "materially adverse" rule would allow many types of retaliatory actions to go completely unaddressed and unpunished. For instance, the D.C. Circuit has held that negative job references to prospective employers and cancelling public events honoring an employee constitute retaliatory behavior, even though such retaliatory actions do not affect the terms and conditions of one's employment. *Passer v. Am. Chem. Soc'y,* 935 F.2d 322, 331 (D.C. Cir. 1991). The "materially adverse" rule does not make clear whether such adverse behavior on an employer's part would fall within the ambit of § 704(a). It also seems to leave open the issue of retaliatory harassment. *See Causey v. Balog,* 162 F.3d 795, 803 (4th Cir. 1998) (recognizing the validity of a § 704(a) retaliatory harassment claim).

Contrary to the majority's position, the Ninth Circuit's "reasonably like to deter" standard adequately addresses the many varied forms of retaliation while safeguarding against a slippery slope effect by disallowing employees from litigating trivial annoyances. The inquiry would not be whether any adverse action has been taken but whether, as a matter of law, the adverse action would deter a reasonable employee from engaging in protected activity. This ferrets out suits alleging frivolous harms, while maintaining suits for very deleterious actions such as supervisor harassment. Moreover, there are no indications that the broad rules still employed in the Ninth, Tenth, and Eleventh Circuits[1] have

---

[1] *See Hashimoto v. Dalton,* 118 F.3d 671 (9th Cir. 1997) (holding that negative job references are actionable under § 704(a)); *Ray,* 217 F.3d at 1243; *Jeffries v. Kansas,* 147 F.3d 1220, 1231-32 (10th Cir. 1998) (holding that, "[i]n recognition of the remedial nature of Title VII, the law in this circuit liberally defines adverse employment action" and "takes a case-by-case approach to determining whether a given employment action is 'adverse'"); *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 984-86 (10th

opened unmanageable floodgates to aggrieved Title VII plaintiffs.

## B.   Why the Majority Opinion Incorrectly Rejected the "Reasonably Likely to Deter" Rule

Notwithstanding legislative, Supreme Court, and administrative support for a broad rule, the majority rejects the "reasonably likely to deter" standard, citing reasons that are less than persuasive.  The majority suggests that the "reasonably likely to deter" standard is too broad.  Yet the rule is no broader than the statutory language requires; nor is it any broader than that which is utilized in tort cases, which often involves a "case-by-case" analysis when compelling courts to employ a "reasonable person" standard in determining what constitutes a duty of care.  The reasonable person standard is readily understandable, is not burdensome and is commonly used in legal discourse.[2]

---

Cir. 1996) (construing Title VII's anti-retaliation provision to protect an employee from a malicious prosecution action brought by a former employer); *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998) (holding that negative job evaluations, demotions, suspensions, disadvantageous transfer and toleration of harassment may be actionable as a retaliation claim).

[2] *Cf. Morris v. Wal-mart Stores, Inc.,* 330 F.3d 854 (6th Cir. 2003) (holding, under Tennessee law, that the reasonable person standard is utilized to determine whether or not sufficient evidence exists when contemplating a directed verdict motion in a res ipsa loquitur negligence case)*; U.S. v. Jones,* 335 F.3d 527 (6th Cir. 2003) (employing a reasonable person standard when adjudicating the presence of apparent authority to determine whether entry was consensual in a Fourth Amendment context); *Five Cap, Inc., v. National Labor Relations Board*, 294 F.3d 768, 786 (6th Cir. 2002) (employing the objective "reasonable person" standard when determining whether or not work conditions are so "unbearable" as to violate § 8(a)(3) of the National Labor Relations Act).

In fact, this Court, in *Thaddeus-X v. Blatter*, previously embraced such an objective standard which the majority now claims to be unreasonable.  175 F.3d 378, 396 (6th Cir. 1999) (en banc).  In *Thaddeus-X*, a case involving a § 1983 action brought by the state inmates against prison officials based on alleged retaliation, we adopted an objective standard in determining what constitutes an "adverse action." *Id*. at 396.  In determining "whether actions of lesser severity merit being deemed 'adverse' for purposes of a retaliation claim, we adopt[ed] the standard suggested by Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), that an adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Id*.  We reasoned that "[t]he benefits of such a standard are that it is an objective inquiry, capable of being tailored to the different circumstances in which retaliation claims arise, and capable of screening [out] the most trivial of actions from constitutional cognizance." *Id*. at 398.

Moreover, The Ninth, Tenth, and Eleventh Circuits all employ such an objective standard, specifically in the Title VII context, and by so doing, none of the Circuits appear to have had any difficulty in determining what is adverse and what is frivolous.  *See, e.g., Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1449 (11th Cir. 1998) (taking an "objective approach" to its case-by-case standard).

Furthermore, retaliation requires a broad rule because retaliation can take many forms, perhaps more than Congress at the time of its drafting could think of or reasonably anticipate.  Nevertheless, it is not the function of this Court to graft its own policy values onto a statute; rather, it is this Court's responsibility to discern Congress' legislative intent in enacting the statute.  In other words, we must determine whether Congress, not this Court, would envision a plaintiff like Sheila White receiving relief from the retaliatory actions allegedly perpetrated against her by Burlington Northern.  Congress' intent is manifest: to provide employees who have

been victimized by discrimination with access to appropriate statutory remedies under Title VII.  *Robinson,* 519 U.S. at 346.

The majority's approach would utilize the same standard for §§ 703 and 704 so that it would not be necessary to undertake individual reviews under the separate sections of the statute when cases arise.  This approach similarly is unavailing since Title VII's statutory language indicates that Congress *intended* for courts to treat general discrimination differently than retaliatory discrimination.  Indeed, the recent Supreme Court case of *Desert Palace* emphasized the importance of statutory construction and the significance of statutory language as the starting point for a court's analysis. 123 S.Ct. at 2153.  Moreover, different purposes are involved here and it is logical that the two sections would be treated differently.  Section 703(a) of Title VII never expected to shield protected groups from every little slight they encounter; its purpose was to assist in getting discriminated-against plaintiffs into the American workforce and to keep them there.  As far as retaliation is concerned, congressional intent was clear: to provide "unfettered access to statutory remedial mechanisms."  *Robinson,* 519 U.S. at 346.

Contrary to the majority's suggestion, the rule on adverse employment actions to which the majority opinion adheres is quite ambiguous.  In an attempt to obviate the need for a court's  case-by-case determination of what actions by an employer would be "reasonably likely to deter" an employee from engaging in protected activity, the majority points to this Court's case law regarding what constitutes a "material adverse employment action."  The majority relies on *Kocsis v. Multi-Care Management, Inc.*, which requires courts to look to "indices unique to a particular situation," when considering whether or not an employment action is materially adverse.  97 F.3d 876, 886 (6th Cir.1996).  This approach ultimately requires a case-by-case review to determine what is "unique" and what is not in each "particular

situation."  Accordingly, if the goal is to provide guidance while making individual review obsolete, it would be more advantageous to utilize a better defined inquiry than that of *Kocsis'* "indices unique to a particular situation."  This is particularly so when there is an alternative approach available which would also advance Title VII's goal of equal access to its protections under the law.  In the present case, the majority opinion concluded that the forklift transfer constituted an adverse employment action by classifying Burlington Northern's action as an example of "indices unique to a particular situation."  While that may satisfactorily dispose of the present case, the majority opinion leaves unclear what other types of adverse actions would fall within the ambit of this category, absent a better delineation of the category.  As a result, employers like Burlington Northern could continue to hide behind mere technicalities and claim that other deleterious harms not encompassed in today's ruling, such as employer-sanctioned retaliatory harassment, do not qualify as adverse employment actions when the employee does not experience a demotion or a material change of duties.

The majority suggests that the EEOC's position, in advocating the "reasonably likely to deter" standard, is inconsistent with its concession that legally cognizable adverse action should not encompass trivial slights.  Yet no inconsistency is apparent.  It is logical that a person pursuing solutions prescribed by EEOC standards would reasonably expect some backlash, in the form of a  limited number of negative consequences, some unhappy colleagues and perhaps even some ostracism.  The EEOC's recommendation, however, allows redress only for those plaintiffs who can show that such retaliatory actions would reasonably deter the charging party from engaging in protected activity.  EEOC Compliance Manual § 8, "Retaliation," ¶ 8008 (1998).  The majority essentially seeks to dismiss the EEOC's approach because it supposedly lacks safeguards against trivial and petty allegations; however, by purporting to exclude trivial and  unsubstantiated  allegations  in  order  to  define  the

"adverse-employment-action element" narrowly so as not to frustrate the purpose of Title VII, the majority actually impedes Title VII's effectiveness.

Moreover, the majority suggests that the "materially adverse" requirement, "properly interpreted . . . accomplishes [§ 704(a)'s purposes] while appropriately counterbalancing the need to prevent lawsuits based upon trivialities" and that the "indices . . . unique to a particular situation" standard accurately captures all other non-trivial actions taken against the employee. Yet *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir. 1999), which utilized the "materially adverse" standard, rejected the employee's argument that her unwarranted negative job evaluation constituted an adverse employment action simply because it was not accompanied by monetary loss or anything else falling into the penumbra of adverse actions listed in *Kocsis,* 97 F.3d at 886. In other words, the "materially adverse" standard was ineffective in *Hollins,* because a negative job evaluation is *not* trivial; it is tangible. It is a black mark on one's record that can have severe future consequences for an employee, inasmuch as an employer can use the unwarranted negative job evaluation to deny the employee future promotions. Similarly, it leaves unaddressed such other deleterious harms such as employer-sanctioned retaliatory harassment. The *Hollins* court made no attempt to utilize the "unique indices" category in order to afford the plaintiff relief. 188 F.3d at 662.

What the majority evidently intends (but fails to state expressly) is that it is unwilling to consider actionable a wide variety of non-trivial, tangible adverse employment actions in order to limit the number of legitimate, legally cognizable claims that can be filed by aggrieved employees. There is no other apparent reason for its analysis.

Finally, the majority also attempts to rely in part on the Supreme Court decision, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998). However, such reliance is also

misplaced. In *Burlington,* the Supreme Court, in devising an agency principle to govern employer liability for a supervisor's harassment of an employee, observed that an employer is always liable for a discriminatory "tangible employment action." The Court distinguished tangible employment actions from actions not obviously attributable to the employer, defining tangible employment actions as "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Id.* at 762. A tangible employment action "requires an official act of the enterprise, a company act," and would include such acts "as discharge, demotion, or undesirable reassignment." *Id.* at 765. Elsewhere in the opinion the Court observed that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington,* 524 U.S. at 761. However, *Burlington* addressed Title VII's § 703(a), not § 704(a) and, as discussed earlier, the respective scopes of § 703(a) and 704(a) necessarily differ.[3]

## C.  Conclusion

In 1999, a panel of this Court held that an adverse employment action, for purposes of a Title VII retaliation claim, must materially affect the terms and conditions of the plaintiff's employment. *Hollins,* 188 F.3d at 662. Our grant of the petition for rehearing *en banc* provided this Court with an opportunity to reconsider the validity of *Hollins*' unreasoned importation of § 703(a)'s definition of an "adverse employment action" into § 704(a) and to clarify

---

[3]The Ninth Circuit in *Ray v. Henderson* found defendant's reliance on *Burlington* similarly misplaced when advocating that Title VII qualifies the type of employment actions that would constitute an "adverse" action. 217 F.3d at 1242, n.5. The Court stated that *Burlington* did not set forth a standard for adverse employment actions in the anti-retaliation context. *Id.*

what actions are sufficiently adverse with respect to retaliation claims. A traditional statutory analysis and recognition of Title VII's legislative intent does not dictate the majority's continuing adherence to the "materially adverse" standard, and the rule set forth by the majority fails to provide the clarity desperately needed in this pervasive area of litigation. The lack of clarity in the majority's approach could result in more court decisions against true victims of § 704(a) retaliation because the employer's retaliatory actions conveniently manage to elude the confines of the "materially adverse" definition. Instead of following the majority approach, I would hold that the retaliatory actions Burlington Northern took against White constituted adverse employment actions because such actions are reasonably likely to deter an employee from engaging in protected activity.

---

## CONCURRING IN PART, DISSENTING IN PART

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. I agree with the majority's treatment of "adverse employment actions" under Title VII, and accordingly join Parts I–III of its opinion in full. I respectfully dissent, however, from the majority's resolution of the punitive damages issues, and accordingly write separately to explain my disagreement with Parts IV–V of the Court's opinion.

At the trial in this case, the district court instructed the jury that it may award punitive damages under Title VII only if the plaintiff proved that she was entitled to them by "clear and convincing" proof. In arguing that the district court erred in this respect and in contending that a punitive damages claim may be proved by a "preponderance" of the evidence under Title VII, the plaintiff relies on two United States Supreme Court decisions and one court of appeals decision. Whether considered together or singly, however, these cases do not support the plaintiff's position.

The first case, *Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148 (2003), holds that "circumstantial" evidence, in addition to "direct" evidence, may be used to prove discrimination in a Title VII mixed-motive case. That holding, however, does not answer today's question since circumstantial evidence may be used to prove facts in cases that require a preponderance of the evidence *and* cases that require proof beyond a reasonable doubt, including criminal cases. *See id.* at 2154 ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."). In reaching its circumstantial-evidence conclusion, it is true, *Desert Palace* noted that Congress's "failure" to specify that only "direct" evidence could be used to prove discrimination

was "significant, for Congress has been unequivocal when imposing heightened proof requirements in other circumstances, including in other provisions of Title 42." *Id.* But that mode of analysis bears on our inquiry only if punitive damages represent a form of conventional relief in the same way that circumstantial evidence represents a form of conventional proof. In my view, that is not the case and accordingly *Desert Palace* does not advance the point. If punitive damages are not a conventional remedy, Congress's "failure" to speak to the question would suggest that the burden of proof traditionally applied to unconventional remedies in general or punitive damages in particular should be used.

Two months before the Court decided *Desert Palace*, it made clear that punitive damages are not a conventional remedy. In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 123 S. Ct. 1513, 1519–20 (2003), the Court explained that punitive damages and compensatory damages "serve different purposes," that punitive damages "are aimed at deterrence and retribution" and "serve the same purposes as criminal penalties," and that special constitutional rules of review apply to such awards. If there is a lesson to be drawn from *Desert Palace* and *State Farm*, it would seem to be that a punitive damages claim represents an unconventional form of relief, which deserves a heightened rather than a run-of-the-mill standard of proof.

The two other cases upon which the plaintiff relies are no more helpful in establishing that a preponderance standard applies to punitive damages claims. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality opinion), also concerned an issue of conventional relief (namely, the quantum of proof in Title VII mixed-motive cases), not an issue related to punitive damages. *Id.* at 253 ("Only rarely have we required clear and convincing proof where the action defended against seeks only conventional relief."). In saying that "[c]onventional rules of civil litigation generally apply in

Title VII cases," *id.*, the plurality of course did not establish that these conventional rules apply to requests for unconventional relief, and if anything suggested just the opposite.

*Karnes v. SCI Colorado Funeral Services, Inc.*, 162 F.3d 1077 (10th Cir. 1998), is even less helpful. In that case, the defendant argued that the higher burden of proof for punitive damages claims *under Colorado law* should apply to Title VII claims. The court disagreed, concluding that state law does not control the answer to the question, then summarily (and mistakenly) relied on *Price Waterhouse* to say that a preponderance standard applies. *Id.* at 1080–81.

It is one thing, I recognize, to say that the cited cases do not answer the question; it is another to determine the answer. In the plaintiff's defense, the statute does not give us a lot to work with in determining what Congress meant. As an initial matter, the statute itself fails to specify a burden of proof, stating only that a plaintiff may recover punitive damages if she "demonstrates" that the defendant intentionally engaged in discriminatory practices. 42 U.S.C. § 1981a(b)(1). In a later subchapter, Congress defines "demonstrates" unhelpfully to mean "meets the burdens of production and persuasion," *id.* § 2000e(m), a definition that chases the tail of the initial inquiry. Nor does the context in which the relevant words appear or the legislative history to the Civil Rights Act of 1991 offer any other insights into the appropriate burden of proof. Pub. L. No. 102-166, § 102, 105 Stat. 1072.

Under these circumstances, it is appropriate to consider other indicators of statutory meaning, analogous Supreme Court precedents and relevant state laws predating the legislation. *See Steadman v. SEC*, 450 U.S. 91, 95 (1981) ("Where Congress has not prescribed the degree of proof which must be adduced . . . this Court has felt at liberty to prescribe the standard, for '[i]t is the kind of question which

has traditionally been left to the judiciary to resolve.'") (quoting *Woodby v. INS*, 385 U.S. 276, 284 (1966)); *see also North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) ("[I]t is not only appropriate but also realistic to presume that Congress was thoroughly familiar with [our] precedents . . . and that it expect[s] its enactment[s] to be interpreted in conformity with them.") (citations and quotations omitted); *Nishikawa v. Dulles*, 356 U.S. 129, 135 (1958) (requiring a clear and convincing standard of proof for voluntary expatriation in the absence of congressional guidance and in the light of analogous Supreme Court precedents); *cf. Santosky v. Kramer*, 455 U.S. 745, 769 (1982) ("A majority of the States have concluded that a 'clear and convincing evidence' standard of proof strikes a fair balance [in parental-rights termination cases].  We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process."); *Addington v. Texas*, 441 U.S. 418, 431–32 (1979) ("We note that 20 states, most by statute, employ the standard of 'clear and convincing' evidence; 3 states use 'clear, cogent, and convincing' evidence; and 2 states require 'clear, unequivocal and convincing' evidence.") (footnotes and emphasis omitted).

By 1991, when Congress authorized punitive damages in Title VII claims, two Supreme Court cases had intimated that a clear and convincing standard ought to apply to punitive damages claims.  In *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1 (1991), decided before Congress amended Title VII, the Court noted that "[t]here is much to be said in favor of a State's requiring, as many do, a standard of 'clear and convincing evidence' or, even, 'beyond a reasonable doubt'" for punitive damages.  *Id.* at 23 n.11 (citations omitted).  Two years earlier, Justice Brennan noted that exceptions exist to the preponderance of the evidence standard "when the government seeks to take unusual coercive action—action more dramatic than entering an award of money damages or other *conventional relief*." *Price*

*Waterhouse*, 490 U.S. at 253 (plurality opinion) (emphasis added)**.**

In analogous settings before 1991, the Supreme Court also had adopted a clear and convincing evidence standard for civil cases involving unconventional relief—in the face of congressional silence about the appropriate burden of proof.  In *Woodby v. INS*, 385 U.S. 276 (1966), the Supreme Court observed that "Congress ha[d] not addressed itself [in the Immigration and Nationality Act] to the question of what degree of proof is required in deportation proceedings," then observed that this is "the kind of question which has traditionally been left to the judiciary to resolve." *Id.* at 284. Reasoning that deportation proceedings fall somewhere between ordinary civil litigation and criminal litigation, the Court held that "clear, unequivocal, and convincing evidence" must support a deportation order—the same burden used in analogous cases involving civil fraud, expatriation, adultery, illegitimacy, lost wills and oral contracts. *Id.* at 285 & n.18. *Compare Nishikawa*, 356 U.S. at 135 (holding that, in the face of congressional silence on the question, proof of an act of expatriation must be by clear and convincing evidence), *with Vance v. Terrazas*, 444 U.S. 252, 265 (1980) (upholding a preponderance of the evidence standard specified by Congress after *Nishikawa*).

Supreme Court decisions analogizing punitive damages to criminal penalties also suggest that a higher burden of proof ought to apply here. *See State Farm*, 123 S. Ct. at 1519–20 ("[P]unitive damages . . . are aimed at deterrence and retribution," and "serve the same purposes as criminal penalties."); *id.* at 1521 ("It should be presumed that a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability . . . is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266 (1981) ("Punitive damages

by definition are not intended to compensate the injured party, but rather to punish the tortfeasor.").

For like reasons, the factual predicate for a punitive damages award—that the defendant acted with "malice" or "reckless indifference," s*ee* 42 U.S.C. § 1981a(b)(1)—has a stigmatizing effect that deserves more evidentiary certainty than the preponderance standard provides. *See State Farm*, 123 S. Ct. at 1521 ("[P]unitive damages should only be awarded if the defendant's culpability is [] *reprehensible*.") (emphasis added); *Addington*, 441 U.S. at 424 ("One typical use of the [clear and convincing] standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant . . . [to] reduce the risk to the defendant of having his reputation tarnished erroneously."); *see also Haslip*, 499 U.S. at 54 (O'Connor, J., dissenting) ("[P]unitive damages are quasi-criminal punishment. Unlike compensatory damages . . . punitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible. Hence, there is a stigma attached to an award of punitive damages that does not accompany a purely compensatory award.").

By 1991, the supreme courts or legislatures of 29 States had directly addressed the issue whether punitive damage claims required a heightened burden of proof. Of those States, 20 of them chose the clear and convincing standard for all punitive damages claims, one State (Colorado) applied the beyond a reasonable doubt standard to these claims and two States (Florida and Oklahoma) applied the clear and convincing standard when the punitive award was a specific multiple of the actual damages in the case. *See* App. A (identifying the burden of proof in each State with respect to punitive damages in 1991). *See also* Michael Rustad & Thomas Koenig, *The Historical Continuity of Punitive Damages Awards: Reforming the Tort Reformers*, 42 Am. U. L. Rev.

1269, 1278 n.63 (1993) (identifying States with a clear and convincing standard in 1993).

When Congress addressed this issue in 1991, it also was doing so in the context of a modern trend in favor of the higher standard—a trend that was well underway before the 1991 amendments to Title VII. The American Bar Association recommended the higher standard in 1986. *See* Special Committee on Punitive Damages, *Punitive Damages: A Constructive Examination*, 1986 A.B.A. Sec. Litig. 33 ("Because one of the purposes of punitive damages is punishment . . . [t]he committee concludes [] that the 'clear and convincing' burden of proof is appropriate for an award of punitive damages. This is the standard often used in fraud cases, to which there is some analogy."). The American Law Institute did the same in 1991. *See* 2 American Law Institute, *Reporters' Study: Enterprise Responsibility for Personal Injury* 264 (1991) ("An enterprise should be liable for punitive damages only when there is clear and convincing evidence of reckless disregard for the safety of others in the decisions made by management officials or other senior personnel."). As of today, the supreme courts or legislatures from 34 States have addressed the burden of proof issue, with 31 now requiring a heightened burden of proof. *See* App. B (identifying the burden of proof for punitive damages in each State as of 2004).

The States within the Sixth Circuit, moreover, are nearly uniform in applying a clear and convincing standard. By 1991, Ohio and Kentucky had established the standard by statute, and Tennessee did so by court decision in 1992. *See* App. A. Although the Michigan courts have not directly addressed the issue, at least one state appeals court has approved, without discussion, a jury instruction requiring proof by a preponderance of the evidence for an award of exemplary damages. *Green v. Evans*, 401 N.W.2d 250, 252 (Mich. Ct. App. 1985). *But see Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980) (noting that exemplary

damages serve only to compensate plaintiffs for "humiliation, sense of outrage, and indignity"—and may not serve as punishment to the defendant).

While there may not be a Rosetta Stone to guide us here, Supreme Court precedents concerning punitive damages and comparable forms of relief, as well as relevant state-law practices, suggest that a clear and convincing standard of proof ought to govern these claims. A claim for punitive damages, in a nutshell, is more akin to claims concerning fraud, deportation and expatriation, oral contracts and illegitimacy than it is to more conventional civil claims. Accordingly, the heightened burden of proof associated with these claims and traditionally associated with punitive damages claims in general ought to apply.

The additional citations identified by the majority in support of the plaintiff's position do not alter this analysis. *Smith v. Wade*, 461 U.S. 30 (1983), deals with whether actual malice is required to obtain punitive damages under § 1983, not with the preponderance/clear and convincing debate raised here. *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277 (2d Cir. 1990), involved a products liability claim under New York law, in which the defendant argued that the Due Process Clause of the United States Constitution *requires* a clear and convincing standard. In rejecting that argument, the court "acknowledg[ed] the force of the argument that since punitive damages are awarded primarily to punish a defendant for past conduct and to deter it and others from similar conduct in the future, a standard of proof appropriate for 'quasi-criminal wrongdoing' should be required." *Id.* at 282.

*In re Exxon Valdez*, 270 F.3d 1215 (9th Cir. 2001), is an admiralty-law decision in which the Ninth Circuit concluded that the district court did not "abuse its discretion" in applying a preponderance standard to a punitive damages claim. *Id.* at 1232–33. Again, the primary debate in the case was whether the Due Process Clause required a higher standard.

Moreover, if like the Ninth Circuit we applied an abuse of discretion to this issue (which we do not), it no doubt would be a very different question whether the district court in this case abused its discretion in imposing the higher standard of proof. The Fourth Circuit's decision in *Notter v. North Hand Protection*, No. 95-1087, 1996 WL 342008 (4th Cir. June 21, 1996), besides being unpublished, rejects only one argument by the employer in that case—that the higher burden of proof for punitive damages claims *under state law* should control the Title VII inquiry. *Id.* at *10. And the Harvard Law Review piece supports the employer's position in this case. In addition to approving "measures that guide and direct juries toward appropriate [] determinations," it notes that "the widespread acceptance of the clear and convincing evidence standard demonstrates [the] states' acknowledgment of the retributive function of punitive damages." *Jury Determination of Punitive Damages*, 110 Harv. L. Rev. 1513, 1532–33, 1536 (1997).

Nor does the cap on punitive damages claims under Title VII advance plaintiff's argument. While a cap on punitive damages addresses one issue in this area (the outer limits of awards), it does not account for the other issues in this area—the appropriate quantum of proof required (1) before a jury may attach a "reprehensibility" label to another's conduct, *State Farm*, 123 S. Ct. at 1521, or (2) before a jury may award punitive damages that have a significant ratio to the underlying compensatory award. In ascertaining the constitutional limits of punitive damages, it is the ratio of the two awards, not the size of the punitive damages award, that the Supreme Court considers in measuring the award's compliance with Due Process—which is why awards under $300,000 may still violate the Constitution and why they still deserve the prevailing burden of proof for punitive damages claims in this country, namely clear and convincing evidence. *See id.* at 1524 (ratios involving "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards

with ratios in range of 500 to 1, or, in this case, of 145 to 1") (citation omitted); *see also Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002) (reducing punitive damages award from $120,000 to $60,000 to correct constitutional deficiency); *Tyson Foods, Inc. v. Stevens*, 783 So. 2d 804, 810 (Ala. 2000) ("In this case, the punitive-damages award of $75,000 is 30 times the compensatory-damages award of $2,500. Considering the facts before us, we find the ratio of 30:1 to be unreasonable."); *Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968, 979 (Ala. 1998) ("The punitive award of $150,000 is 170 times the compensatory award of $880. That 170:1 ratio is unacceptable.").

But that is not the most significant problem with invoking the damages cap in this instance. All agree that Congress did not give the courts particularly helpful guidance here, requiring us to answer what the burden of proof for a federal punitive damages claim should be in the face of congressional silence. An answer that says punitive damages claims receive a preponderance standard when the award is under $300,000 but receive a clear and convincing standard when the award is some higher amount to be named later does not seem very helpful. Neither do I understand how the damages cap could make a difference in the outcome of this case. If, in this instance, the Court had concluded that a clear and convincing standard generally applies to punitive damages claims in the face of congressional silence, the existence of a cap of this sort by itself could not alter the presumption. If instead the Court had concluded that a preponderance standard generally applies in this setting, the existence of a damages cap would make no difference at all. Either way, in other words, the outcome would be unaffected by the existence of the cap.

I have one other qualm with the majority's decision on this point—which is reaching the burden of proof issue at all. I do not understand how White could prevail on remand in a punitive-damages-only trial, no matter what the burden of

persuasion is. Because we required an en banc hearing to decide whether White suffered an adverse employment action and, notably, to determine whether this Circuit embraced the ultimate-employment-decision test, it would not seem possible for a jury to conclude that Burlington Northern acted with reckless disregard for White's federally-protected rights in imposing the *suspension*. *See* 42 U.S.C. § 1981a(b)(1) (requiring proof that the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual"); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999) ("The terms 'malice' or 'reckless indifference' pertain to the employer's *knowledge* that it may be acting in *violation of federal law*, not its awareness that it is engaging in discrimination.") (emphasis added); *id.* at 537 (recognizing that imposing punitive damages would be inappropriate when "[t]he underlying theory of discrimination [is] novel or otherwise poorly recognized").

A punitive damages claim with respect to the *transfer* count is even harder to imagine. Until now, no Sixth Circuit case (to my knowledge) has found a cognizable Title VII claim arising from a lateral transfer, let alone a transfer *within* an employee classification and without a loss in pay. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) ("[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims.") (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987)). While the opinion concludes that this transfer count is cognizable under Title VII, its reasons for doing so could not support a finding that Burlington Northern acted with "malice" or "reckless indifference" to White's rights.

For these reasons, I respectfully dissent from Parts IV and V of the Court's opinion.

## APPENDIX A

### State Burdens of Proof for Punitive Damages in 1991

By 1991, the supreme courts or legislatures of the following States had adopted a higher burden of proof for awarding punitive damages:

| | |
|---|---|
| Alabama | Ala. Code § 6-11-20(a) (1991) (clear and convincing evidence). |
| Alaska | Alaska Stat. § 09.17.020 (1991) (clear and convincing evidence). |
| Arizona | *Linthicum v. Nationwide Life Ins. Co.,* 723 P.2d 675, 680–81 (Ariz. 1986) ("[W]hile a plaintiff may collect compensatory damages upon proof by a preponderance of the evidence of his injuries due to the tort of another, we conclude that recovery of punitive damages should be awardable only upon clear and convincing evidence of the defendant's evil mind."). |
| California | Cal. Civ. Code § 3294(a) (1991) (clear and convincing evidence). |
| Colorado | Colo. Rev. Stat. § 13-25-127(2) (1991) (beyond a reasonable doubt). |
| Florida | Fla. Stat. Ann. § 768.73(1)(b) (1991) (punitive damages exceeding three times actual damages must be proved by clear and convincing evidence). |
| Georgia | Ga. Code Ann. § 51-12-5.1(b) (1991) (clear and convincing evidence). |
| Hawaii | *Masaki v. Gen. Motors Corp.,* 780 P.2d 566, 575 (Haw. 1989) ("[F]or all punitive damage claims we adopt the clear and convincing standard of proof."). |

| | |
|---|---|
| Indiana | Ind. Code § 34-4-34-2 (1991) (clear and convincing evidence). |
| Iowa | Iowa Code § 668A.1(1)(a) (1991) (clear and convincing evidence). |
| Kansas | Kan. Stat. Ann. § 60-3702(c) (1991) (clear and convincing evidence). |
| Kentucky | Ky. Rev. Stat. Ann. § 411.184(2) (1991) (clear and convincing evidence). |
| Maine | *Tuttle v. Raymond*, 494 A.2d 1353, 1363 (Me. 1985) ("[W]e hold that a plaintiff may recover exemplary damages based upon tortious conduct only if he can prove by clear and convincing evidence that the defendant acted with malice."). |
| Minnesota | Minn. Stat. § 549.20(1)(a) (1991) (clear and convincing evidence). |
| Montana | Mont. Code Ann. § 27-1-221(5) (1991) (clear and convincing evidence). |
| Nevada | Nev. Rev. Stat. 42.005(1) (1991) (clear and convincing evidence). |
| North Dakota | N.D. Cent. Code § 32-03.2-11 (1991) (clear and convincing evidence). |
| Ohio | Ohio Rev. Code Ann. § 2315.21(C)(3) (1991) (clear and convincing evidence). |
| Oklahoma | Okla. Stat. tit. 23 § 9.1.A (1991) (punitive damages exceeding the amount of actual damages must be proved by clear and convincing evidence). |
| Oregon | Or. Rev. Stat. § 41.315(1) (1991) (clear and convincing evidence). |

| | |
|---|---|
| South Carolina | S.C. Code Ann. § 15-33-135 (1991) (clear and convincing evidence). |
| Utah | Utah Code Ann. § 78-18-1(1)(a) (1991) (clear and convincing evidence). |
| Wisconsin | *Wangen v. Ford Motor Co.*, 294 N.W.2d 437, 458 (Wis. 1980) ("We hold that the [clear, satisfactory and convincing evidence] burden of proof shall apply to punitive damages claims hereafter."). |

By 1991, the supreme courts or legislatures of the following States had rejected a higher burden of proof for awarding punitive damages:

| | |
|---|---|
| Connecticut | *Freeman v. Alamo Mgmt. Co.*, 607 A.2d 370, 375 (Conn. 1992) ("We disagree . . . with the . . . conclusion . . . that clear and convincing proof is an appropriate standard of proof whenever claims of tortious conduct [such as those involving punitive damages] have serious consequences or harsh or far-reaching effects on individuals or require the proof of willful, wrongful and unlawful acts."). |
| Idaho | Idaho Code § 6-1604(1) (1991) (preponderance of the evidence). |
| Mississippi | *Gaylord's of Meridian, Inc. v. Sicard,* 384 So. 2d 1042, 1045 (Miss. 1980) ("Although the damages are by way of penalizing the defendant against whom they are sought, the proof is by a preponderance of the evidence rather than beyond a reasonable doubt.") *overruled on other grounds by C & C Trucking Co. v. Smith,* 612 So. 2d 1092, 1105–06 (Miss. 1992); *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1188 (Miss. 1990) ("[T]he law requires a finding of 'bad faith-*plus*'—based upon a preponderance of the evidence—before punitive damages may be awarded."). |

| Missouri | *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 75 (Mo. 1990) ("The defendant argues that punitive damage submissions should require 'clear and convincing' evidence. This requirement is contrary to our normal requirements in the submission of civil cases. We are not disposed so to hold, or to follow cases from other jurisdictions so holding."). |
|---|---|
| New Mexico | *United Nuclear Corp. v. Allendale Mut. Ins. Co.,* 709 P.2d 649, 654 (N.M. 1985) ("It is the general rule . . . that issues of fact in civil cases are to be determined according to the preponderance of the evidence . . . . We are not convinced that the degree of proof should be changed [to require clear and convincing evidence] in punitive damage areas."). |
| South Dakota | *Flockhart v. Wyant*, 467 N.W.2d 473, 475 (S.D. 1991) ("[S.D. Codified Laws § 21-1-4.1] does *not* establish a clear and convincing evidence standard but merely requires clear and convincing evidence to show a *reasonable* basis [to believe the defendants committed acts warranting punitive damages]. The clear and convincing language merely modifies the 'reasonable basis' language to make a prima facie showing that punitive damages *may* be in order."). |

By 1991, the supreme courts and legislatures of the following States had yet to address the question whether claims for punitive damages require a heightened burden of proof, though (as noted below) some lower courts had addressed the issue and some supreme courts had mentioned, without discussing, jury instructions requiring a preponderance of the evidence:

| Arkansas | *Nat'l Bank of Commerce v. McNeill Trucking Co., Inc.*, 828 S.W.2d 584, 591 (Ark. 1992) (Dudley, J., concurring) ("I would hope that the possible changes discussed in this opinion [*i.e.* the adoption of a clear and convincing standard for punitive damages] might be brought before this court in an adversarial manner . . . . It is a matter which we have never addressed."). |
|---|---|
| Delaware | *Cloroben Chem. Corp. v. Comegys*, 464 A.2d 887, 891–92 (Del. 1983) ("We now turn to Cloroben's contention that the jury improperly awarded punitive damages in that they were not supported by a preponderance of the evidence . . . . Our review of the record indicates that there is sufficient evidence to support a finding . . . [and] we must reject the argument that there was insufficient evidence to support an award of punitive damages."); *Guthridge v. Pen-Mod, Inc.*, 239 A.2d 709, 715 (Del. Super. Ct. 1967) (instructing the jury that "[p]unitive damages may be awarded only if the jury finds by a preponderance of the evidence that the defendants' actions were motivated by some form of malice."). |
| Illinois | *Illinois Terminal R.R. Co. v. Thompson*, 71 N.E. 328, 333 (Ill. 1904) (approving a jury instruction that "left it to the discretion of the jury to impose whatever damages they might choose, even to the extent of allowing punitive damages" by a preponderance of the evidence). |

Louisiana

*Galjour v. Gen. Am. Tank Car Corp.,* 764 F. Supp. 1093, 1100–01 (E.D. La. 1991) ("In fact, there are no Louisiana cases which specifically discuss the appropriate burden of proof for exemplary damages . . . . The defendants' argument that a heightened burden of proof should apply to exemplary damages is not without merit, as shown by recent legislative enactments in other jurisdictions, but it is not the law in Louisiana. Until the Louisiana legislature takes action to raise the burden, the law is that the burden of proof for exemplary damages is by a preponderance of the evidence.") (footnote omitted); *see also Int'l Harvester Credit Corp. v. Seale*, 518 So. 2d 1039, 1041 (La. 1988) ("Under Louisiana law, punitive or other 'penalty' damages are not allowable unless expressly authorized by statute.").

Maryland

*Gorman v. Sabo,* 122 A.2d 475, 479 (Md. 1956) ("There is no doubt that punitive damages may be recovered in [this] case . . . . The applicable law was correctly put to the jury by the trial court in his charge. He told them the Sabos must prove their case 'by a fair preponderance of the evidence.'") (citation omitted); *Thorne v. Contee*, 565 A.2d 102, 108 (Md. Ct. Spec. App. 1989) ("In order for the issue of punitive damages to go to the jury, Thorne must have produced sufficient evidence of Contee's wanton or reckless conduct to meet the preponderance of the evidence test."), *cert. denied*, 569 A.2d 643 (Md. 1990); 569 A.2d 1242 (Md. 1990).

Massachusetts

*Santos v. Chrysler Corp.,* No. 921039, 1996 WL 1186818, at *3 (Mass. Super. Ct. Sept. 18, 1996) ("Chrysler contends that the court erred because it failed to instruct the jury that they must find by clear and convincing evidence that Chrysler was grossly negligent before they could award punitive damages. The contention is meritless. Under Massachusetts law the burden of proof in civil proceedings of this kind is satisfied 'by a fair preponderance of the evidence.'") (citation omitted), *aff'd in part and remanded on other grounds*, 715 N.E.2d 47 (Mass. 1999).

Michigan

*Green v. Evans*, 401 N.W.2d 250, 252 (Mich. Ct. App. 1985) (approving, without discussing the burden of proof, a jury instruction stating: "Such exemplary damages only are recoverable if the Plaintiff has proven by a preponderance of the evidence, malice, willful and wanton misconduct or negligence so great as to indicate reckless disregard of the rights of another."). *But see Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980) (noting that exemplary damages only serve to compensate plaintiffs for "humiliation, sense of outrage, and indignity"—exemplary damages may not serve as punishment to the defendant).

Nebraska

*Distinctive Printing & Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. 1989) ("[P]unitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction.").

New Hampshire

New Hampshire has not addressed the burden of proof for punitive damages. *See* N.H. Rev. Stat. Ann. § 507:16 (2004) ("No punitive damages shall be awarded in any action, unless otherwise provided by statute.").

| | |
|---|---|
| New Jersey | *Fischer v. Johns-Manville Corp.,* 512 A.2d 466, 482 (N.J. 1986) (refusing to address the burden of proof in punitive damages cases because "the parties have not briefed or argued the issue, nor have the courts below addressed it"); *see also Jackson v. Consol. Rail Corp.,* 538 A.2d 1310, 1321 n.5 (N.J. Super. Ct. App. Div. 1988) ("Defendant also attacks the punitive damage verdict because the court in its charge did not place the burden on plaintiff to prove same by 'clear and convincing' evidence. However, that is not the present standard applicable in New Jersey."). |
| New York | *Greenbaum v. Handelsbanken,* 979 F.Supp. 973, 982 (S.D.N.Y. 1997) ("[T]he Court determines that until . . . higher authorities elect[] to address the question, the preponderance of the evidence standard should apply to punitive damages deliberations."). |
| North Carolina | *Caudle v. Benbow,* 45 S.E.2d 361, 362 (N.C. 1947) (approving, without discussing, a jury instruction requiring the jury to "first find by the preponderance of the evidence the presence of actual malice"). |

| | |
|---|---|
| Pennsylvania | *Martin v. Johns-Manville Corp.,* 494 A.2d 1088, 1098 n.14 (Pa. 1985) (Hutchinson, J., delivering the judgment of the court and an opinion joined by only one of the five remaining justices) (recognizing that many jurisdictions have adopted a clear and convincing standard and concluding: "We believe the goal of limiting punitive damage awards in the context of products liability litigation is best served by focusing on the nature of the defendant's conduct instead of increasing the plaintiff's burden of persuasion."); *Rizzo v. Michener,* 584 A.2d 973, 979 (Pa. Super. Ct. 1990) ("The trial judge must determine in the first instance whether the plaintiff has presented sufficient evidence to support a punitive damage claim, which requires evidence on which the jury might reasonably conclude that outrageous conduct has been established by a preponderance of the evidence."), *appeal denied,* 596 A.2d 159 (Pa. 1991). |
| Rhode Island | Rhode Island has not addressed the burden of proof for recovering punitive damages. |
| Tennessee | Tennessee first addressed the burden of proof for punitive damages in 1992 in *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 900–01 (Tenn. 1992), and held that the clear and convincing standard applies to all claims for punitive damages. |
| Texas | *Lawson-Avila Const., Inc. v. Stoutamire,* 791 S.W.2d 584, 594 (Tex. Ct. App. 1990) ("We . . . continue to follow the Texas precedent established by the Courts of this State and hold that the burden of proof in cases involving . . . exemplary damages is by a preponderance of the evidence [and not clear and convincing evidence].") (internal quotations omitted), *writ of error denied* (Dec. 12, 1990). |

| | |
|---|---|
| Vermont | Vermont has not addressed the burden of proof for recovering punitive damages. |
| Virginia | *Peacock Buick, Inc. v. Durkin*, 277 S.E.2d 225, 227 n.3 (Va. 1981) (approving, without discussing the burden of proof, a jury instruction stating: "[I]f you believe from a preponderance of the evidence that the defendant acted wantonly, oppressively, or with such recklessness as evinced a conscious disregard of the rights of others, or with such malice as implied a spirit of mischief, or criminal indifference to civil obligations, you may award the plaintiff such additional sum as punitive damages."). |
| Washington | *Sintra, Inc. v. City of Seattle,* 935 P.2d 555, 566 (Wash. 1997) (holding, without addressing the burden of proof, that the trial court properly instructed the jury that it could award punitive damages on the 42 U.S.C. § 1983 claim 'only if you find [by a preponderance of the evidence] that the conduct of an individual defendant was malicious or taken in reckless disregard of plaintiffs' rights'") (alteration in original). *But see Dailey v. North Coast Life Ins. Co.,* 919 P.2d 589, 590 (Wash. 1996) ("Since its earliest decisions, this court has consistently disapproved of punitive damages as contrary to public policy."). |
| West Virginia | *Goodwin v. Thomas*, 403 S.E.2d 13, 16 (W. Va. 1991) (reinstating an award of punitive damages, without discussing the burden of proof, based on the following jury instruction: "[I]f you find from a preponderance of all the evidence in this case, that the actions of the Defendants in evicting the Plaintiff were in total disregard of the Plaintiff's rights as a lessee in the leased premises and that such actions were willful and wanton then you may award the Plaintiff punitive damages."). |
| Wyoming | *Campen v. Stone*, 635 P.2d 1121, 1127 (Wyo. 1981) (approving, without discussing the burden of proof, a jury instruction stating: "Punitive damages can properly be awarded . . . only if, one of the following [acts] has been proven by a preponderance of the evidence.") (internal quotations omitted). |

## APPENDIX B

### State Burdens of Proof for Punitive Damages in 2004

As of today, the supreme courts or legislatures from the following States have adopted the higher burden of proof for awarding punitive damages:

| | |
|---|---|
| Alabama | Ala. Code § 6-11-20(a) (2004) (clear and convincing evidence). |
| Alaska | Alaska Stat. § 09.17.020(b) (2004) (clear and convincing evidence). |
| Arizona | *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675, 680–82 (Ariz. 1986) ("[W]hile a plaintiff may collect compensatory damages upon proof by a preponderance of the evidence of his injuries due to the tort of another, we conclude that recovery of punitive damages should be awardable only upon clear and convincing evidence of the defendant's evil mind."); *Saucedo ex rel. Sinaloa v. Salvation Army,* 24 P.3d 1274, 1277 (Ariz. Ct. App. 2001) ("In Arizona, to recover punitive damages, a plaintiff must prove by clear and convincing evidence that a 'defendant's wrongful conduct was guided by evil motives or wilful or wanton disregard of the interests of others.'") (citation omitted), *review denied* (Oct. 3, 2001). |
| California | Cal. Civ. Code § 3294(a) (2004) (clear and convincing evidence). |
| Colorado | Colo. Rev. Stat. § 13-25-127(2) (2004) (beyond a reasonable doubt). |
| Florida | Fla. Stat. Ann. § 768.725 (2004) (clear and convincing evidence). |

| | |
|---|---|
| Georgia | Ga. Code Ann. § 51-12-5.1(b) (2004) (clear and convincing evidence). |
| Hawaii | *Schefke v. Reliable Collection Agency, Ltd.*, 32 P.3d 52, 71 (Haw. 2001) ("Clear and convincing evidence of 'some wilful misconduct or . . . entire want of care which would raise presumption of a conscious indifference to consequences' supports an award of punitive damages.") (internal quotations omitted). |
| Idaho | Idaho Code § 6-1604(1) (2004) (clear and convincing evidence). |
| Indiana | Ind. Code § 34-51-3-2 (2004) (clear and convincing evidence). |
| Iowa | Iowa Code § 668A.1(1)–(2) (2004) (clear and convincing evidence). |
| Kansas | Kan. Stat. Ann. § 60-3702(c) (2004) (clear and convincing evidence). |
| Kentucky | Ky. Rev. Stat. Ann. § 411.184(2) (2004) (clear and convincing evidence). |
| Maine | *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 818 A.2d 995, 1001 (Me. 2002) ("'[I]n order to recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant acted with malice.'") (quoting *Tuttle v. Raymond*, 494 A.2d 1353, 1354 (Me. 1985)). |
| Maryland | *Owens-Illinois, Inc. v. Zenobia,* 601 A.2d 633, 657 (Md. 1992) ("[I]n *any* tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages."); *Carter v. Aramark Sports and Entm't Servs., Inc.*, 835 A.2d 262, 287 (Md. Ct. Spec. App. 2003) ("The 'clear and convincing' standard of proof applies to make out a claim for punitive damages."). |

| | |
|---|---|
| Minnesota | Minn. Stat. § 549.20(1)(a) (2004) (clear and convincing evidence). |
| Mississippi | Miss. Code Ann. § 11-1-65(1)(a) (2004) (clear and convincing evidence). |
| Missouri | *Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 111 (Mo. 1996) ("For common law punitive damage claims, the evidence must meet the clear and convincing standard of proof."); *Hoskins v. Bus. Men's Assurance*, 116 S.W.3d 557, 564 (Mo. Ct. App. 2003) ("Punitive damages are properly submitted in a negligence [or strict liability] case only if there is clear and convincing evidence that 'at the time of the negligent act, the defendant[s] knew or had reason to know that there was a high degree of probability that the action would result in injury.'") (citation omitted). |
| Montana | Mont. Code Ann. § 27-1-221(5) (2004) (clear and convincing evidence). |
| Nevada | Nev. Rev. Stat. 42.005(1) (2004) (clear and convincing evidence). |
| New Jersey | N.J. Stat. Ann. § 2A:15-5.12(a) (2004) (clear and convincing evidence). |
| North Carolina | N.C. Gen. Stat. § 1D-15(b) (2004) (clear and convincing evidence). |
| North Dakota | N.D. Cent. Code § 32-03.2-11(1) (2004) (clear and convincing evidence). |
| Ohio | Ohio Rev. Code Ann. § 2315.21(C)(2) (2004) (clear and convincing evidence). |
| Oklahoma | Okla. Stat. tit. 23, § 9.1.B–.D (2004) (clear and convincing evidence). |

| | |
|---|---|
| Oregon | Or. Rev. Stat. § 18.537(1) (2004) (clear and convincing evidence). |
| South Carolina | S.C. Code Ann. § 15-33-135 (2004) (clear and convincing evidence). |
| Tennessee | *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn. 1992) ("[A] plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence."); *Barnett v. Lane*, 44 S.W.3d 924, 928 (Tenn. Ct. App. 2000) ("[A]n award [of punitive damages] is only appropriate when the necessary conduct has been shown 'by clear and convincing evidence.'"). |
| Texas | Tex. Civ. Prac. & Rem. Code Ann. § 41.003(b) (2004) (clear and convincing evidence). |
| Utah | Utah Code Ann. § 78-18-1(1)(a) (2004) (clear and convincing evidence). |
| Wisconsin | *Wangen v. Ford Motor Co.*, 294 N.W.2d 437, 458 (Wis. 1980) ("We hold that the [clear, satisfactory and convincing evidence] burden of proof shall apply to punitive damages claims hereafter."); *City of West Allis v. Wis. Elec. Power Co.*, 635 N.W.2d 873, 881 (Wis. Ct. App. 2001) ("The evidence [supporting a punitive damages award] must also be 'clear and convincing.'"), *pet. for review denied,* 643 N.W.2d 93 (Wis. 2002). |

As of today, the supreme courts or legislatures from the following States have rejected a higher burden of proof for awarding punitive damages:

| | |
|---|---|
| Connecticut | *Freeman v. Alamo Mgmt. Co.,* 607 A.2d 370, 375 (Conn. 1992) ("We disagree . . . with the . . . conclusion . . . that clear and convincing proof is an appropriate standard of proof whenever claims of tortious conduct [such as those involving punitive damages] have serious consequences or harsh or far-reaching effects on individuals or require the proof of willful, wrongful and unlawful acts."). |
| New Mexico | *United Nuclear Corp. v. Allendale Mut. Ins.,* 709 P.2d 649, 654 (N.M. 1985) ("It is the general rule . . . that issues of fact in civil cases are to be determined according to the preponderance of the evidence . . . . We are not convinced that the degree of proof should be changed [to require clear and convincing evidence] in punitive damages areas."). |
| South Dakota | *Flockhart v. Wyant,* 467 N.W.2d 473, 475 (S.D. 1991) ("[S.D. Codified Laws § 21-1-4.1] does *not* establish a clear and convincing evidence standard but merely requires clear and convincing evidence to show a *reasonable* basis [to believe the defendants committed acts warranting punitive damages]. The clear and convincing language merely modifies the 'reasonable basis' language to make a prima facie showing that punitive damages *may* be in order."). |

As of today, the supreme courts and legislatures from the following States have yet to address the question whether claims for punitive damages require a heightened burden of proof,  though (as noted below) some lower courts have addressed the issue and some supreme courts had mentioned, without  discussing,  jury  instructions  requiring  a preponderance of the evidence:

| | |
|---|---|
| Arkansas | *Nat'l Bank of Commerce v. McNeill Trucking Co., Inc.*, 828 S.W.2d 584, 590 (Ark. 1992) (Dudley, J., concurring) ("I would hope that the possible changes discussed in this opinion [*i.e.* the adoption of a clear and convincing standard for punitive damages] might be brought before this court in an adversarial manner . . . . It is a matter which we have never addressed."). |
| Delaware | *Cloroben Chem. Corp. v. Comegys*, 464 A.2d 887, 891–92 (Del. 1983) ("We now turn to Cloroben's contention that the jury improperly awarded punitive damages in that they were not supported by a preponderance of the evidence . . . . Our review of the record indicates that there is sufficient evidence to support a finding . . . [and] we must reject the argument that there was insufficient evidence to support an award of punitive damages."); *Guthridge v. Pen-Mod, Inc.*, 239 A.2d 709, 715 (Del. Super. Ct. 1967) (instructing the jury that "[p]unitive damages may be awarded only if the jury finds by a preponderance of the evidence that the defendants' actions were motivated by some form of malice."). |
| Illinois | *Illinois Terminal R.R. Co. v. Thompson*, 71 N.E. 328, 333 (Ill. 1904) (approving a jury instruction that "left it to the discretion of the jury to impose whatever damages they might choose, even to the extent of allowing punitive damages" by a preponderance of the evidence). |

Louisiana

*Hill v. Sampson*, 628 So. 2d 81, 84 (La. Ct. App. 1993) ("While this argument has theoretical appeal, we are not inclined by these judicial means to establish 'clear and convincing evidence' as the standard of proof for exemplary damages under [Louisiana's DUI law]. In our view, had the legislature intended a higher standard of proof than that of a preponderance of the evidence, it would have clearly so indicated."); *Rivera v. United Gas Pipeline Co.*, 697 So. 2d 327, 335 (La. Ct. App. 1997) (holding that earlier interpretation of Louisiana's hazardous substance handling statute "says nothing of creating a 'clear and convincing' burden of proof, and this Court is not prepared to create one . . . . Ergo, until the Louisiana legislature takes direct action, the burden of proof for exemplary damages is by a preponderance of the evidence."), *cert. denied*, 704 So. 2d 1196, 1197 (La. 1997).

Massachusetts

*Santos v. Chrysler Corp.,* No. 921039, 1996 WL 1186818, at *3 (Mass. Super. Ct. Sept. 18, 1996) ("Chrysler contends that the court erred because it failed to instruct the jury that they must find by clear and convincing evidence that Chrysler was grossly negligent before they could award punitive damages. The contention is meritless. Under Massachusetts law the burden of proof in civil proceedings of this kind is satisfied 'by a fair preponderance of the evidence.'"), *affirmed in part and remanded on other grounds*, 715 N.E.2d 47 (Mass. 1999).

Michigan

*Green v. Evans*, 401 N.W.2d 250, 252 (Mich. Ct. App. 1985) (approving, without discussing the burden of proof, a jury instruction stating: "Such exemplary damages only are recoverable if the Plaintiff has proven by a preponderance of the evidence, malice, willful and wanton misconduct or negligence so great as to indicate reckless disregard of the rights of another"). *But see Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980) (noting that exemplary damages only serve to compensate plaintiffs for "humiliation, sense of outrage, and indignity"—exemplary damages may not serve as punishment to the defendant).

Nebraska

*Distinctive Printing & Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. 1989) ("[P]unitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction.").

New Hampshire

New Hampshire has not addressed the burden of proof for punitive damages. *See* N.H. Rev. Stat. Ann. § 507:16 (2004) ("No punitive damages shall be awarded in any action, unless otherwise provided by statute.").

New York    *Greenbaum v. Svenska Handelsbanken,* 979 F. Supp. 973, 978–82 (S.D.N.Y. 1997) ("[T]he Court determines that until . . . higher authorities elect[] to address the question, the preponderance of the evidence standard should apply to punitive damages deliberations."). *Compare Munoz v. Puretz,* 753 N.Y.S.2d 463, 466 (N.Y. App. Div. 2003) ("In order to recover punitive damages, a plaintiff must show [certain conduct] by 'clear, unequivocal and convincing evidence.'") (citation omitted), *with In re Seventh Judicial Dist. Asbestos Litig.,* 593 N.Y.S.2d 685, 686–87 (N.Y. App. Div. 1993) ("The trial court properly instructed the jury that the evidentiary standard for proving entitlement to punitive damages is preponderance of the evidence, not clear and convincing evidence.").

Pennsylvania    *Martin v. Johns-Manville Corp.,* 494 A.2d 1088, 1098 n.14 (Pa. 1985) (Hutchinson, J. delivering the judgment of the court and an opinion joined by only one of the five remaining justices) (recognizing that many jurisdictions have adopted a clear and convincing standard and concluding: "We believe the goal of limiting punitive damage awards in the context of products liability litigation is best served by focusing on the nature of the defendant's conduct instead of increasing the plaintiff's burden of persuasion."); *Rizzo v. Michener*, 584 A.2d 973, 979 (Pa. Super. Ct. 1990) ("The trial judge must determine in the first instance whether the plaintiff has presented sufficient evidence to support a punitive damage claim, which requires evidence on which the jury might reasonably conclude that outrageous conduct has been established by a preponderance of the evidence."), *appeal denied*, 596 A.2d 159 (Pa. 1991).

Rhode Island    Rhode Island has not addressed the burden of proof for recovering punitive damages.

Vermont    Vermont has not addressed the burden of proof for recovering punitive damages.

Virginia    *Peacock Buick, Inc. v. Durkin*, 277 S.E.2d 225, 227 n.3 (Va. 1981) (approving, without discussing the burden of proof, a jury instruction stating: "[I]f you believe from a preponderance of the evidence that the defendant acted wantonly, oppressively, or with such recklessness as evinced a conscious disregard of the rights of others, or with such malice as implied a spirit of mischief, or criminal indifference to civil obligations, you may award the plaintiff such additional sum as punitive damages."); *RF & P Corp. v. Little*, 40 S.E.2d 908, 914 (Va. 1994) (holding that a preponderance of the evidence standard applies to a knowing and willful violation of a statute resulting in a civil fine, and the clear and convincing evidence standard applies only "to certain cases that are equitable in nature, such as suits involving fraud and misrepresentation, undue influence, [or] estoppel.").

Washington    *Sintra, Inc. v. City of Seattle,* 935 P.2d 555, 566 (Wash. 1997) (stating, without addressing the burden of proof, that the trial court properly instructed the jury that it could award punitive damages on a 42 U.S.C. § 1983 claim "only if you find [by a preponderance of the evidence] that the conduct of an individual defendant was malicious or taken in reckless disregard of plaintiffs' rights.") (quotation omitted and alteration in original). *But see Dailey v. North Coast Life Ins. Co.*, 919 P.2d 589, 590 (Wash. 1996) ("Since its earliest decisions, this court has consistently disapproved of punitive damages as contrary to public policy.").

| West Virginia | *Goodwin v. Thomas*, 403 S.E.2d 13, 16 (W. Va. 1991) (finding sufficient evidence to support an award of punitive damages, without discussing the burden of proof, based on the following jury instruction: "[I]f you find from a preponderance of all the evidence in this case, that the actions of the Defendants in evicting the Plaintiff were in total disregard of the Plaintiff's rights as a lessee in the leased premises and that such actions were willful and wanton."). |
|---|---|
| Wyoming | *Campen v. Stone*, 635 P.2d 1121, 1127 (Wyo. 1981) (approving, without discussing the burden of proof, a proposed jury instruction stating: "Punitive damages can properly be awarded . . . only if, one of the following [acts] has been proven by a preponderance of the evidence."). |